I. A. PASCHAL AND OTHERS V. W. H. DANGERFIELD AND OTHERS.

1. In 1860 the parties litigant filed a written agreement, that the venue should be changed and the cause be tried by the judge below, without a jury. Subsequently, material changes were made in respect of parties to the suit. The cause came to trial in 1871, and defendants demanded a jury; but their previous agreement was enforced against them, and the cause was tried by the judge. *Held*, that, under the circumstances, the agreement should not have been considered binding, and a jury should have been allowed.

2. Suit for land in B. county was there brought, but the venue was changed to H. county, and there a new party was permitted to intervene as a plaintiff, claiming part of the land. The defendants pleaded want of jurisdiction in the court of H. county, to entertain the intervention, alleging that the land lay in a different county, and that the intervention was an original action so far as the intervenors were concerned. *Held*, that the plea should have been sustained, and the intervention dismissed.

3. Several owners of distinct parcels of an entire tract of land cannot, even under our liberal practice, maintain a single joint suit for the recovery of the entire tract. Each should sue for his respective parcel.

4. Suit for land was brought in 1855, by parties who deraigned title under an alleged grant made in 1807. Defendants, claiming under patents from the State, based on locations made in 1846, impeached the grant on the ground that it was never anything but an imperfect or inchoate grant. At the trial the plaintiffs, over objection by the defendants, were permitted to prove declarations of the grantee asserting ownership of the lands, and also allowed to put in evidence the will of the grantee, who died in 1814, and who, in her will, asserted ownership, and made a disposition of the land. *Held*, that the objections of the defendants, on the general ground of incompetency, were well taken; and it was error to overrule them, and to admit the declarations and the will as evidence to support the alleged grant.

5. An inchoate or incipient title is imperfect, and requires some additional exercise of the granting power before the fee will pass. Such an imperfect title does not imply ownership, either against the sovereign or against individuals.

6. An imperfect title, which emanated from a former government, and was never recognized by the existing one, forms no foundation for an action, and can have no standing in our courts.

7. The doctrine of presumption of grants being involved in this case, the former decisions of this court are reviewed and considered; and the rulings in Herndon *v.* Casiano, 7 Texas, 323; Paul *v.* Perez, 7 Texas,

18

339, and others of the earlier cases, on this important question, are regarded as having been materially changed or modified by the later decisions in Taylor v. Watkins, 26 Texas, 688; Biencourt v. Parker, 27 Texas, 558, and other cases.

8. In 1807, the Governor of Coahuila and Texas made to Donna F. D. a concession of land, under which a survey was made, and an act of possession executed to her. But the concession required the grantee to appear before the Intendente of San Luis Potosi, and obtain from him a confirmation of her title. There being no evidence of such a confirmation by the Intendente, the plaintiffs, who claim under the concession, invoke a presumption of such confirmation, by virtue of the lapse of time, and of such possession as they were able to prove. See the opinion for the reasons why such presumption cannot be indulged, and for the general principles controlling the presumption of grants from the governments which preceded the Republic.

9. The ten years' statute of limitation cannot confer title as against the government; nor does it begin to run as between individuals, until the title of the government has been divested.

APPEAL from Bexar. Tried below before the Hon. G. H. Noonan.

The property involved in this long-protracted litigation was two leagues of land lying on the Salado, four or five miles east of the city of San Antonio. The present is the second suit between the parties which has been prosecuted to a trial upon the merits, and this is the second occasion on which this present suit has appeared in this court. In 1857, it was reversed and remanded (11 Texas, 536), and the report of that decision explains the attitude in which the case went back for the new trial, which resulted in the present appeal.

The plaintiffs filed an amended petition in 1858, alleging that, after the death of the original grantee, Donna Feliciana Duran Cubier, under whom they claim, the land was partitioned in equal parts among her five children; and they set up their respective interests in severalty under the partition. The defendants excepted to the amended petition, assigning a misjoinder of plaintiffs, and that the plaintiffs could not prosecute a joint suit for the recovery of their alleged interests in severalty. The exception was overruled, and the ruling was saved, and is assigned as error.

The material facts respecting the other bills of exception are sufficiently indicated in the opinion of the court.

The character of the grant to Madame Duran Cubier is disclosed in the former reports of this controversy in 11 Texas, 579, and 20 Texas, 537. Nothing appeared to be wanting to its completeness, except confirmation by the Intendente of San Luis Potosi; and this requirement, according to the translated copy in evidence, was expressed as follows: " It being under-" stood that the aforesaid Señora shall secure the amount of " sixty dollars, which is the value of said· two leagues of " land, according to the circumstances of the water (there " being no irrigation), in order that, with the said sum and " a certified copy of these proceedings, she may appear, either " in person or by attorney, at the Intendency of San Luis " Potosi, to obtain the titles of confirmation, according to " the provisions of a Royal decree of the 14th of February, " 1805."

This suit was originally brought in Bexar county, on the 25th of October, 1854. At the spring term, 1855, the venue was changed to Hays county, where the case came to trial, and resulted in the judgment and appeal reported in 20 Texas, 536. Being then remanded to Hays county, Maria Jesusa Smith y Lee, as administratrix of her former husband, John W. Smith, and joined by James B. Lee, her present husband, filed her petition of intervention on the 8th of November, 1858, claiming a part of the land in controversy, by deed from one of the heirs and devisees of the original grantee. On the 28th of November, 1859, these intervenors amended, alleging that in July, 1854, they had commenced suit in Bexar county, which suit had been removed to Gonzales county, and was there dismissed on the 12th of April, 1859 ; and they filed a transcript from Gonzales District Court, and prayed that this intervention be taken as a continuation of their suit.

Answering these intervenors, the defendants pleaded to the jurisdiction of the Hays District Court, because the intervention was an original proceeding, and the land lay in Bexar

county. The court below overruled this plea, and this ruling was saved and assigned as error.

On the 1st of December, 1860, there was an agreement of parties that the cause be returned to Bexar county, and be there tried by the court without a jury.

The cause came to trial in Bexar county at the February term, 1871. The defendants demanded a jury, but they were held precluded by their agreement made in 1861, and they reserved exceptions, and assign error upon them. New parties joined as plaintiffs at this term. At the trial, the court below overruled all preliminary pleas, and all demurrers and exceptions, and adjudged the grant to Madame Duran Cubier to be a valid and subsisting grant, and that the fee of the land is in her heirs, and their assigns. The judgment proceeded to approve and establish a survey, which had been made under order of the court, and to decree to the several plaintiffs, and the intervenors, their respective portions of the land, and canceled the locations, surveys, and patents of the defendants, awarding writs of possession against them, etc.

The defendants moved for a new trial, but their motion was overruled, and they gave notice of appeal.

The foregoing statement is by no means a full history of the case; but, in connection with the former reports in 11 and 20 Texas, and with the opinion now reported, it is believed to present everything of practical significance. The parties were numerous, and their pleadings complicated; but details of these features of the case are not necessary.

*Waelder & Upson*, and *R. Paschal*, for the appellants. The briefs of these counsel have not reached the hands of the reporter.

*G. W. Paschal*, also for the appellants, filed a very able and exhaustive argument upon the whole case, but it is necessarily too elaborate to be inserted in full. After stating the case he proceeded as follows:

### THE LAW OF IMPERFECT TITLES.

In Paschal v. Perez, 7 Texas, 367, Chief Justice Hemphill made the following points: That an imperfect title was one which required something further to be done; that one precisely such as in this case was imperfect; he gives the royal ordinance of 1754, showing the exclusive jurisdiction of the intendants; that this final act of the intendant was not shown to exist, and it was indispensably necessary; that the errors in regard to incipient titles were the rule, but they were none the less fatal; that, by the regulations of 1754, fifty-four ·years was the limit of prescription, which would work confirmation of title; and all who possessed lands, by sales from such delegates, to 1700, and whose titles had not been confirmed, were required to apply to the proper authorities for that purpose. (2 White's Recop., 64.) That it was said that the Lieutenant Governor did make concessions, directed lands to be surveyed, and caused grantees to be put in possession; but this did not give such vested title as might not be legally disavowed by the Spanish Government; that such claims depend for their sanction and completion upon the sovereign power, and have no standing in an ordinary judicial tribunal, until they are confirmed, and the legal title vested in the claimant. (See particularly pages 367–371. Paschal's Digest of Decisions, Sections 7041–7061.)

And to these may be added the following general principles,· upon which the opinion rested:

We have held in numerous cases, from Reily, Assignee, v. The Board of Land Commissioners, Dallam, 381, decided in 1841, to Smith, Assignee, v. The State, that the recognition of imperfect claims to lands, originating under a former government, depends upon the will of the existing sovereignty; that this recognition appertains to the political authorities, and does not and cannot, in the first place, emanate from the courts of justice. And until there be some such act of recognition, such claims are not the proper subjects of judicial cognizance.

(Jones v. Borden, 5 Texas, 412.) It belongs to the legislative department to give construction and effect to provisions of the Constitution regulating the distribution of the public domain. It is placed within its control by the express provisions of that instrument, and it appertains not to the judiciary to determine authoritatively whether the provisions are susceptible of a different construction, or to attempt, in any mode not sanctioned by law, the survey and distribution of the public lands of the country. (Trimble v. Smithers, 1 Texas, 802; Jones v. Menard, 1 Texas, 771; Massey v. Papin, 24 How., 364; Frisbie v. Whitney, 9 Wallace, 187.)

The survey and order of survey, made under the colonization law, were not, *proprio vigore*, titles which were entitled to judicial standing in themselves—that is, not " evidence of a " right to ‧ land that has been recognized by the laws," as referred to in the statute of limitation, unless the holder of such order of survey presented the same to some board of land commissioners, and made such proof as was required by the general land law of 1837. (Jones v. Menard, 1 Texas, 771.) In the above case, Judge Lipscomb reviewed and affirmed the doctrine of Les Bois v. Brammel, 4 How., 449, which requires the new government to recognize inchoate titles before they have judicial standing. It is a political power. The‧ orders of survey protected by the Constitution of the republic were those alone issued by the commissioners of colonies to colonists and settlers for their head-right claims. (Trimble v. Smithers, 1 Texas, 790.) In this case Chief Justice Hemphill reviews the cases, and asserts the power of the new government to have abrogated all the laws of the former government, and the rights secured by them; but quotes Perchman's case, 7 Pet., 51, to show that such a course would have been inconsistent with the rules of modern civilization. It belongs to the legislative department to give construction and effect to the provisions of the Constitution regulating the distribution of the public domain. It is placed within its control by the express provisions of that instrument, and it appertains not to the judiciary

to determine authoritatively, whether the provisions are susceptible of a different construction, or to attempt, in any mode not sanctioned by law, the survey and distribution of the public lands of the country. (Trimble v. Smithers, 1 Texas, 802.)

A concession or imperfect title, at the time of the conquest, is only a charge upon the conscience of the body politic. Until recognized by the new political sovereignty, it has no, *proprio vigore*, standing in court, but remains a dormant right. (Smith v. The United States, 10 Pet., 332 ; Buyck v. The United States, 15 Pet., 215 ; O'Hara v. The United States, 10 Pet., 275 ; United States v. Delespine, 10 Pet., 319; United States v. Miranda, 16 Pet., 153.) There are later decisions of this high tribunal, in which they assert in emphatic terms that no standing can be given in courts of justice to inchoate claims under the former government of Louisiana and Florida, until recognized by the political authority of the United States. (Choteau v. Eckhart, 2 How., 344; Byrd v. Montgomery, 6 Mo., 514; Mackay v. Dillon, 7 Mo., 10 ; Barry v. Gamble, 3 How., 56 ; Les Bois v. Brammel, 4 How., 459 ; The United States v. Lawton, 5 How., 28; Menard's Heirs v. Massey, 8 How., 293 ; Stoddard v. Chambers, 2 How., 285 ; Mills v. Stoddard, 8 How., 345; Trimble v. Smithers, 1 Texas, 806–809.) It is no longer an open question that an imperfect title, emanating from a former and unrecognized by the existing government, forms no foundation for an action. (Paschal v. Perez, 7 Texas, 366.)

An order of survey and survey, under the colonization laws, was not " evidence of right to land that has been recognized " by the laws," which, *proprio vigore*, could have any standing in court. The right was inceptive and inchoate ; the title remained in the sovereignty, and it required some action of the political authority to consummate it. (Jones v. Menard, 1 Texas, 782. Paschal's Digest of Decisions, Sections 7062–7064.)

And, what was equally controlling, Chief Justice Hemphill, in Paschal v. Perez, added : " No attempt was made to show

" that the power of the intendant had been subsequently vested " in the governor or commandant general, or in any other offi- " cer, or, if it had, that the title had been confirmed by any " such officer."

Such an attempt would have to be supported as a matter of law, and no Such law exists; and the subsequent effort to ex- ercise such a power, by the Texas authorities, was pronounced a usurpation. (Jones v. Garza, 11 Texas, 205–207; Jones v. Muisenbach, 26 Texas, 236; Norton v. Mitchell, 13 Texas, 50.)

In Jones v. Garza, 11 Texas, 206, 207, it is expressly said that, while the doctrine of presumptions maintained in Hancock v. McKinney, 7 Texas, 384; Titus v. Kimbro, 8 Texas, 210; Jenkins v. Chambers, 9 Texas, 167; Bissell v. Haynes, 9 Texas, 556, will be regarded, yet it must always be proved that the authority exercised did appertain to the person or officer exercising it, and that in fact there was no proof of any granting power, after the revolution, until the passage of the colonization laws.

· And in the United States v. Cambuston, 20 How., 63, Mr. Justice Nelson said : " The question here is not whether the " fact of the habitual grant of lands, by Mexican governors, " of the Territory of California, to settlers, and also whether " the customary mode and manner adopted in making grants " do not furnish presumptive evidence both of the existence " of the power and of a compliance with the forms of law in " the execution. We agree that the affirmative of these ques- " tions has been frequently determined by this court, in cases " involving Spanish titles in the Territories of Louisiana and " Florida. (Arredondo's case, 6 Pet., 729, 731; Delasus's " case, 9 Pet., 134; Peralta's case, 19 How., 347.) But no " such presumptions are necessary or admissible in respect to " Mexican titles, since the act of August 18, 1824, and the " regulations of November 21, 1828. Authority to make the " grants is there expressly conferred on the governors, as well " as the terms and conditions prescribed upon which they shall

"be made. The court must look to these laws for both the "power to make the grant and for the mode and manner of "its exercise." This is the correct doctrine, and it is equally applicable to this case.

When the plaintiffs assumed that length of the time presumes that the concession to Cubier had been confirmed, or that a grant had been made, they are met with the fact, that such a confirmation could only have been made by the intendant, and that such a confirmation must have been of record; but from the very promulgations of the time, the presumption is, that no such confirmation was attempted. And when they assume that such a power could be exercised by some other granting officer, they are met by the fact, that there was no such power in Texas, before the introduction of the colonization laws; and that these laws conferred the power of granting, not of confirming titles, upon the governor; and his concessions were all original and of record. This is precisely in accordance with the rule in Goode v. McQueen's Heirs, 3 Texas, 253, 255. The thing must be shown to have been done, and done in accordance with written law.

So in Edwards v. Davis, 3 Texas, 325, this same governor, Salcedo, in 1810, had made a confirmation of the land to a Mexican. It was surveyed, but the title was never confirmed. Afterwards, in 1827, the son of the grantee applied to the Mexican authorities for a confirmation of the title, the parties having remained in possession now seventeen years, cultivating the land. Chief Justice Hemphill says: "It is clear that up "to the application for the grant, in 1827, the property in the "soil was still vested in the government, and, consequently, it "depended entirely upon the pleasure of the then existing au- "thorities, whether their inchoate claims should be recognized "and perfected into a title."

The executive did recognize the equity, and granted to the party a complete title. But his acts were held to be subject to the colonization laws, and the title being within the border leagues, and the consent of the President of Mexico not having

been shown, the original concession and the governor's act were held to be void.

This case really establishes two propositions:

*First.* That the inchoate title, with nearly forty years' possession, had no judicial standing.

*Second.* That any confirmation had to be in accordance with the Mexican colonization laws.

In the present case, the inchoate title, issued by the same officers, stands precisely upon the same footing. No such length of possession exists, and there was never any effort made to obtain a confirmation or new grant.

We have seen that fifty-four years was the limit of prescription under the Spanish regulations, which would work out a confirmation of the title. And that all who possessed lands from the sub-delegates subsequent to 1700, and whose titles had not been confirmed, had to apply to the proper authorities for that purpose, existed after 1818, until the establishment of the colonization laws. (2 White's Recop., 64; Paschal *v.* Perez, 7 Texas, 370.)

So that, had there been a confirmation proved, as there was in reference to the Bastrop grant (11 Texas), it would fall to the ground for want of authority. But in this case there was no such pretense. It stands naked and unsupported, except what is sought to be established by a presumption growing out of five years' occupancy.

## As to Pretended Occupancy.

And as to occupancy, the chief justice (in Perez *v.* Paschal) said:

" In relation to the presumption of confirmation by lapse of " time, it is sufficient to say, to whatever extent this may be " lawfully indulged in support of an actual occupation, with " claim of ownership, yet it cannot arise, at least until a much " longer time has elapsed, from such acts of ownership as are " proved in this case."

We invite attention to the fact, that the occupancy by Perez

was of a much longer and more permanent character than in this case.  Perez broke down, because of the character of his ownership, and the fact that his title had received no recognition, either by the Mexican government or the republic of Texas; and hence it stood upon no better footing than *amparos*, which can in no wise be the foundation of an action or defense.

## PRESUMPTIONS.

And as without confirmation by the intendant, or some subsequent political authority, the title had no judicial standing, it only remains to inquire whether the occupation from 1808 until 1813 was of such continuous length as to raise a presumption of a confirmation or of a grant.

As the doctrine started upon my own argument, I suppose I ought to stand sponsor for its baptism, growth, and fruits, and be in at its death.

The leading case, and that upon which all the misapprehensions in regard to the law rest, is that of Lewis *v.* San Antonio, 7 Texas, 288.

The petition alleged an original grant or concession of the lands claimed, made by the Spanish authorities, when the government exercised dominion over this country, to the people and inhabitants of San Fernando, now San Antonio, at the time of its foundation; that the said grant or concession existed, and was preserved in the archives of Bexar for many years; that the city authorities of San Antonio had for more than one hundred years exercised jurisdiction and ownership over the land embraced in said boundaries; and that the political authorities of the former governments had always refused to grant lands within said limits, on the ground that the same belonged to the city as its *exidos.*

The claim was thus, not to the land in fee, upon the original grant, but an incorporeal hereditament, or right of common: just such a use as the proof sustained—no more, no less.

The authorities relied on, in my brief, were The United States *v.* New Orleans, 10 Pet., 725, 726 ; 1 White's Recop., 96 ; 1 Greenl. Ev., Section 45 ; Rex *v.* Brown, Cowper, 110 ; Mayor of Kingston *v.* Horner, Cowper, 57, 102 ; Withnell *v.* Gartham, 6 Term, 396 ; Reed *v.* Brookman, 3 Term, 159 ; Roe *v.* Ireland, 11 East, 280 ; Goodlittle *v.* Baldwin, 11 East, 408 ; 2 Stark. E., 672 ; Jackson *v.* Mackall, 10 Johnson, 377. An examination of these cases will show that every one of them concerned grants technically, that is, incorporeal hereditaments or franchises : things that were intangible, imaginary, and ideal. They have no reference to patents or grants to land in fee.

The only English case referred to, which bears a semblance to a land grant, was that of Parker *v.* Ireland, 11 East, 488. But in that case there was a reservation against any grant within the forest of Dean. And as the king never grants his forests, but only certain franchises, such as hunting and warrens in them, as the facts will show, the controversy was not about a patent or grant to the land, but a franchise grant of an incorporeal hereditament within the forest of Dean, which was reserved from all such grants.

All these authorities were applicable to the San Antonio case, because the grant of the *exidos* was the grant of a franchise, that is, of a use. And the claim to use this property in fee, or to sell and dispose of it, rested, not upon the ancient grant, but upon the act of incorporation. And even that favor has since been held to be revokable by the repeal of the charter, as in the Brownsville case (Bass *v.* Fontleroy, 11 Texas, 698), and thus restoring the property to the public, or granting the property to another before the city authorities exercised the power to sell, as in San Antonio *v.* Odin, 15 Texas, 539.

But none of these English cases justify the assumption that there can be a presumption of grant to land as against the government.

Nor do the cases cited by Professor Greenleaf, in Chapter 4, Sections 1 to 17, infringe the English rule. Section 17

shows that he has reference to incorporeal hereditaments. And all that is said in reference to land is our own doctrine, as to acquiring title from possession under the statutes of limitation, where there was an adverse title. But *non constat* that there is any such rule as to vacant lands.

The rules quoted from the Recopilacion and the law of Toro, relate exclusively to jurisdictions and franchises.

It may be admitted that there are certain loose expressions in Paul *v.* Perez, 7 Texas, 339, and Herndon *v.* Casiano, 7 Texas, 323, which seem to sink the distinctions between grants to franchises, or incorporeal hereditaments, and grants to land. In the last-named case, Casiano claimed under a possession of ninety years. The proof showed judicial proceedings in Texas and Mexico as early as 1757, in which the validity of the Mencheca title to fifteen leagues and of the preference of the Hernandez title to four leagues was admitted.

It was doubtless a suit about the conflict of boundaries, and the priority of grants were in controversy. The suits were compromised, and the titles settled. The contents and loss of the testimonio were proved, and it was admitted that the archives did not show the original.

Mr. Justice Wheeler ruled that the protocol belonged to Mexico, and not to the archives of Texas; that the testimonio or second original was satisfactorily proved (Smith *v.* Townsend, Dallam, 332); that the length of possession, over fifty years, upon the authority of Mitchell *v.* The United States, 9 Pet., 760; Landry *v.* Martin, 15 La., 139; Barclay *v.* Howell, 6 Pet., 498, 513, was sufficient to authorize the presumption of a grant. This was, of course, taken in connection with the facts that the grant had been seen and its contents proved by a witness, without objection; that its validity had been recognized by the judicial authorities, original and appellate, who had passed upon it; and that its adversary, one hundred and twenty years agone, had acknowledged its validity and compromised with it.

The presumption, therefore, which the court indulged was,

not that an inchoate concession, shown to have had no judicial standing, had been confirmed, or that an original grant, about which there was no proof, had been made.

In Paul *v.* Perez, 7 Texas, 339, which opinion was delivered on the same day, it was admitted that the defendant had lived on the land from the year 1803 to 1836 ; that he cultivated it, and had a large stock of cattle there ; that the place had been settled by his father, from what time is not stated ; that he left in 1836, saying he would return, and did return in 1847 ; that his stock continued there ; and that he had an agent there during this absence, though this was denied by other witnesses.

Proceedings showing the action of the ayuntamiento touching the land were read. The title papers of Perez could not be found in the archives. The learned judge says that " there " can be no doubt that if it is in proof that there was no " claim of perfect title set up, under which the defendant " occupied, used, and cultivated the land, neither directly nor " informally, no presumption of a grant, valid in law, can be " raised."

This is precisely the case under consideration. There not only was no claim set up, but the records show that the appellees had disclaimed any such title.

In Paul *v.* Perez the court was disposed to give effect to the proof of written title, and it was fairly inferred that the title had existed in the archives, and was lost ; but it was simply said, that the circumstances as to the archives, taken together with the long use and occupation and cultivation, and the erection of a stone house, remove the impression which, if standing alone, would have arisen from the asking for an *amparo.*

The court simply refers to the cases of Lewis *v.* San Antonio, and Herndon *v.* Casiano, as justifying the finding of a court in favor of a valid grant.

While it is admitted that the cases of Herndon *v.* Casiano and Paul *v.* Perez lose sight of the fact that the whole doc-

trine, in reference to the presumption of non-existing grants, has its foundation in grants to franchises, as the word grant imports, this court cannot overlook the fact that no such principle was called for, and therefore that the cases are not authority.

So absurd and dangerous a theory, founded upon mistaken reading and unphilosophical data, could not long exist in an enlightened country. Accordingly, we find that without going to the root of the evil, and saying that the whole doctrine, when applied to patents and grants to lands in fee, is founded in error, the court has overruled the precedents, until the whole theory in Herndon v. Casiano, Perez v. Paul, and Dangerfield v. Paschal, has been destroyed.

Thus, in Smith v. Power, 23 Texas, 30, the defendant pleaded three and ten years' limitation, and also relied upon his paper title. But the paper title was held to be void, as it must be in this case. The party then relied upon the prescription of three and ten years. But to these Mr. Justice Wheeler said, that where the grant was void in its inception (as wanting the consent of the federal executive), or where it was valid in its inception, and had since been annulled (as in Marsh v. Weir, 21 Texas, 97); or where, it might have been added, the inceptive title had issued, but it had never been completed, such void act could not be title or color of title, emanating from the sovereignty of the soil, and it could not serve as the basis of limitation.

That eminent lawyer, the lamented Judge Hughes, like the counsel in this case, determined to profit by lingering doubt of Mr. Justice Wheeler, in regard to the loose *dicta* in Herndon v. Casiano, Paul v. Perez, and Dangerfield v. Paschal; so he resolved to see if there was anything in the doubt, or to drive the court from it. So in Plummer v. Power, 29 Texas, 6, he brought the doctrine of prescription sharply before the court; and on p. 11 he says all that could be said on that side. He said:

" But, again, the survey will authorize us to presume a grant,

" perfect in all its parts, from the lapse of time, accompanied
" with the adverse possession, which was proved. This pre-
" sumption is the application of a rule of evidence of the
" forum ; and whether the possession was during the existence
" of a former government makes no difference. If the Mexi-
" can power had continued, the possession might not have been
" sufficient; but that not being so, and we now being governed
" by the rules of evidence of the common law, those rules are
" to be applied to a possession affecting the right of recovery.
" (Lewis v. City of San Antonio, 7 Texas, 288.) And the
" grant in question was offered in evidence properly, to show
" the boundary of the possession claimed. (Dangerfield v.
" Paschal, 11 Texas, 579.) The presumption generally, in
" countries or States governed by the common law of England,
" arises from possession for twenty years, founded on the statute
" 21 James I., Chapter 16, barring rights of entry within twenty
" years. (Lewis v. San Antonio, 7 Texas, 288.) Our statute of
" 1841, Section 14, Hart: Dig., Article 2390, is like the English
" statute, but with a period of ten instead of twenty years pre-
" scribed for the time of limitation. We are, if governed by
" principle, to rest upon the presumption from possession of ten
" years of our law, instead of twenty years under the English
" statute.

" Not only grants, but everything else which is necessary to
" quiet a long-standing possession, will be presumed. (Lynch
" v. Branch Bank of Kentucky, 5 J. J. Marsh., 562 ; Matthews
" on Presumptive Evidence.) "

But to this argument, after due consideration, Mr. Justice
Moore replied :

" And, although the contrary doctrine was intimated in some
" of the earlier decisions of the court, it is now conclusively
" established, that the instruction given the jury in the Dis-
" trict Court—that the plaintiffs were entitled to a verdict, if
" they had shown ' ten years' peaceable and exclusive adverse
" possession before,' prior to the commencement of the original
" suit, in which judgment had been taken against them—can-

" not be sustained upon the doctrine of presumed grants.
" This question was very fully considered and ably discussed
" by Mr. Justice Bell, in Watkins *v.* Taylor, 26 Texas, 688, and
" Yancey *v.* Norris, 27 Texas, 40 ; and though the facts, cer-
" tainly in the latter case, were much more favorable than here
" presented, the court held them insufficient to raise the pre-
" sumption, or to cure a defect in a title similar to that in the
" title under which these parties claim to have entered upon
" and held the land here in controversy.  Since that time the
" same question has been before the court several times, and
" the opinions in said câses have been uniformly sanctioned,
" approved, and followed.  (Walker *v.* Hanks, 27 Texas, 535 ;
" Biencourt *v.* Parker, 27 Texas, 558.)  And it would be now
" a profitless consumption of time to review the grounds upon
" which the conclusions there attained were rested, or to enter
" upon a new and original discussion of the question."

This conclusive proposition had been preceded by the doc-
trine in Smith *v.* Power, 23 Texas, 34, 35 ; that is, that time
could not begin to run until the government had parted with
the title by patent : "It is evident, therefore, that no defense
" could have been interposed to this recovery, under this statute
" of limitations, if the imperfect titles under which the other
" parties claimed the land could have been made available for
" this purpose."  Thus the loose *dicta* in Herndon *v.* Casiano,
Paul *v.* Perez, and Dangerfield *v.* Paschal, which were not called
for in either case, never acquiesced in by the bar, at war with
all our laws in reference to record titles, dangerous to the peace
of society, and repugnant to public policy, were expressly over-
ruled upon the later authorities of Biencourt *v.* Parker, 27
Texas, 558 ; Walker *v.* Hanks, 27 Texas, 535 ; Yancey *v.* Nor-
ris, 27 Texas, 40 ; and Watkins *v.* Taylor, 26 Texas, 688.

*S. G. Newton,* for the appellees.  The brief filed by this
counsel, on the submission of the cause, has not reached the
reporter.  But his printed argument in support of his motion
for a re-hearing presents a new and forcible view of the prin-

cipal questions raised by the other side. The re-hearing was not allowed. The argument was as follows :

There is a history and law connected with and pertaining to the extension of titles to land in the American provinces of Spain, and while they were such provinces, which, to my knowledge, have never been presented to any court having such titles under consideration ; not in the Federal Courts, or in those of Missouri, Louisiana, or Florida, because the circumstances did not require it; and not in Texas, because, in every case, upon a grant like the one in this, presumptions have been resorted to, to sustain the title, rather than unqualified legal right.

The case at bar would seem to require the production of this history and this law, and in presenting this motion for re-hearing, I respectfully beg of the court its indulgent attention to my views.

We have in the Royal Regulation of October 15th, 1754, 2 White's Rec., 62, the Royal Order of August 24th, 1770, 2 White's Rec., 245 and 478, the Royal Ordinance of December 4th, 1786, 2 White's Rec., 67, in the Royal Cedula of 1805, 2 White's Rec., 99, in the historic and official documents and practice of the officials construing them, the law as it was then understood, acted upon, and accepted, both by the Crown of Spain and the people of New Spain. And from all which I maintain that after the 24th day of August, 1774, the political and military governors of provinces had the right of granting and distributing royal lands, and that their titles conveyed a full and indefeasible right to the land described, even against the sovereign, unless in the single event he should through his proper officers institute inquiry for the purpose of vacating or setting the grants aside. (9 Peters, 120; 8 Id., 452 ; 12 How., 217 ; 19 How., 345.)

To sustain myself in this position, I refer to the royal order of October 22, 1798, 2 White's Rec., 245 and 477, and to the preamble to the General Regulations and instructions of Moralez, for the concession of lands in Louisiana and West

Florida, 2 White's Rec., 234; and also to the case of Menard's Heirs *v.* Massey, 8 Howard, 301.

In assuming this position I am aware that I am apparently in opposition to every adjudication of every American court upon this subject; but at the same time I feel that I am only apparently so, and not so in reality; for the law and the reason of the law in this case, as I understand it, has not, to my knowledge, been before the courts for consideration.

The conclusions of our courts, so far as expressed upon titles of the kind under review, were controlled and governed by those of the Supreme Court of the United States, and of the States of Missouri and of Louisiana, without taking into consideration our different locality, system, circumstances, and history.

The Louisiana, Missouri, and Federal courts, were governed in their conclusions by the action of Moralez, *ad interim* intendente of the Provinces of Louisiana and West Florida, and by the provisions of the treaties by which the United States acquired those provinces.

The reason of the law, as adjudicated in Louisiana, Missouri, and Florida, grew out of a dispute arising between General De Lemos, Governor of the provinces of Louisiana and West Florida, and Moralez, *ad interim* intendente. De Lemos, under the royal order of August 24th, 1774, claimed the right of granting and distributing royal lands, and in the opinion of Moralez had made some improvident and unpatriotic dispositions.

In order to check him Moralez claimed the supreme authority under the Regulations of 1754. De Lemos replied with the order of 1774, and would not recede. Disagreeing, they each appealed to the Prince of Peace at Madrid, each stating his case the most favorably to himself. (2 White's Rec., 469.) The appeal was decided in 1798 (2 White's Rec., 245), in favor of Moralez, but not on the ground of want of power in De Lemos, or governors of provinces, but only in that province for the reason assigned, revoking the power in the gov-

ernors and restoring it to the intendente of that province. (2 White's Rec., 245 and 477, 478.) Moralez, having his authority. restored to him, established his regulations and instructions regulating the concession of lands in his jurisdiction. (2 White's Rec., 234 *et seq.*) And these regulations and instructions, with the treaties before referred to, became the law of the courts in deciding upon Spanish land titles in those provinces. But it will not be claimed that this law had extraterritorial force, or could at all influence our courts, except in strictly parallel cases. It will not be claimed that any such exist with us, and I frankly concede the legal effect of the action of Moralez. The treaty stipulations acknowledged them, and commissions and tribunals were established by United States authority to carry them out. (8 Howard, 307; 4 U. S. Statutes at Large, 52.) It is believed that in no case when the governors and sub-delegates made a fair grant, were their acts set aside, or the grant disaffirmed for the want of power in them; but in the Provinces of Coahuila and Texas they had no such order as that of 1798 to Moralez and De Lemos— no regulations like those of Moralez, no treaties with the United States. Therefore, the rules in one instance cannot be invoked to make law for the other.

If, then, the laws as then adjudicated had no extra-territorial force, it should not be invoked to destroy titles in this country, and I am convinced from my readings of the decisions of the Supreme Court of the United States, and particularly that of Menard's Heirs *v.* Massey, and its criticisms upon former investigations of the same court, that in the absence of the treaty stipulations and of Moralez's acts, they would have held the grants of the governors to have been a sufficient conveyance of the title from the sovereign under the law as it stood when the change of sovereignty was made, and, therefore, to be upheld under the new *régime.* (7 Peters, 86; 12 Id., 437.)

If correct in these views, how does it leave the law with us as a part of the great empire when the Duran grant was made, in the absence of regulations, instructions, or treaties, modify-

ing or controlling it?    The governors of provinces, or sub-delegates of the intendentes, as they were by the law, had the power to make grants, and deliver possession, in the name of the king.    The very term "sub-delegate" or agent of the intendente conveys with it the idea of acting in his place and stead, exercising his authority and powers in the premises.

But I am here met with the assertion that the title itself puts a limit upon its effect and the power of the governor, by permitting, or commanding, if you like, the recipient to appear before the intendency of San Luis Potosi, to obtain the titles of confirmation.    (8 Peters, 436; 16 Id., 198.)

If I am so far correct in my conclusions as to the powers of the governors, then this command signifies but little, and that is this, that the title is sufficient to maintain the possession of the holder against all the world except the king.    If it is desired that he also must be concluded, then the confirmation must be had.    Hence the application of the decree of 1805, which says, "those things which the king gives to any one "cannot be taken from him either by the king or any one "else," etc., etc.    (2 White's Rec., 99.)    The reference in this connection to this law, though by mistaken date, is in my mind conclusive evidence of the reason why a confirmation should be had; and Articles 19 and 38 of the Moralez regulations confirm this position, and particularly the latter, where notice is given of the intention to investigate (2 White's Rec., 239, 243), and are in conformity with the royal regulations of 1754 and 1786, which do not permit the action of the sub-delegates to be set aside without notice to the holder of the grant.    (12 Peters, 444; 15 Id., 138; 16 Id., 198.)

In addition to what has been said, I am strongly fortified by the universally accepted doctrine, that a public officer exercising certain powers as pertaining to his office, is presumed to be possessed of the power until the contrary be shown.    (9 Peters, 134; Id., 711.)    And we do no violence to reason or law by so holding in this case, for the governors were the sole political as well as military authority of their provinces, and

their orders and will expressed, was the law to the citizen, unless avoided by appeal to superior authority. In them the king was represented, and it is not surprising that among their other political powers was that of granting lands, subject alone to review by the intendente, for the purpose of setting it aside after notice to the party to be affected thereby. The Spanish as well as the civil law permitted no act to be done affecting the rights of individuals without notice.

Pursuing the inquiry from the foregoing premises, we find the officer assuming to act in the name of his sovereign, receiving the petition, making the necessary inquiry, passing upon the subject, ordering the survey, directing the petitioner to be put in possession, with full dominion, and as owner to her own use, directing the original papers to be archived in his office, a certified transcript, or testimonio, to be issued to her as evidence of her right—and that testimonio is the paper in evidence in this cause.

Under the Spanish law of the time, the delivery of possession was necessary to the acquisition of title to property. (1 White's Rec., 341, *et seq*.) When of corporeal things it was actual, otherwise symbolical, and it was necessarily more than an idle form. And where delivery was made there was no more receding; the dominion changed, the new occupant could defend against all trespassers. So, when Antonio Cordero, colonel of cavalry and governor of the Province of Coahuila and *pro tem.* of Texas, in view of the proceedings had, and as he says, " using the power which the king has granted to me, " by virtue of my office I adjudge them in his royal name (the " said lands) to Da. Maria Feliciana Duran," etc., etc., commissioning an alcalde of the town to make the survey and execute the formal act of delivery of possession, which he did, he was using no idle words, issuing no idle commands, performing no idle ceremonies ; he was undertaking nothing but what he was authorized and required by law to do. He was holding the same office and performing the same duties, in the provinces of Coahuila and Texas, that De Lemos was in the

provinces of Louisiana and West Florida; and as I have shown that De Lemos did have the authority to grant by virtue of his office, it cannot, in view of all the facts, be reasonably claimed that the powers of Cordero were less.

In fact, the document embraces every necessary act of a public officer at the time to make a perfect grant (leaving out the reference for confirmation). Without that it would import completeness on its face. And if I am correct in my views upon the object of that reference, then the grant is complete and gave the dominion and fee against all the world, except the person of the king. Then, being in possession by reason of legal right, Madam Duran at the time could have defended that possession against any trespasser or claim asserted of the character of the one at the bar; and if she could thus defend, she could as well prosecute, and the courts of the time and the government itself would have sustained the title in that case as it is; and of this the proof is abundant in the fact that there is no case on record or referred to, where, under the Spanish government, a right of possession thus acquired was defeated by private parties. And further, as Judge Catron says, there is no case known where the intendente or crown refused to confirm a grant thus made when applied to by the party, or of the United States doing the same in like cases when application was made to the proper authority. The most that could be said in this instance is, that the circumstances are only those of omission until the powers of the intendente had been subverted. There was no injury to the body politic or to individuals, hence there could be no penalty. There was afterwards no representative of the king claiming the right to confirm, hence no necessity of confirmation. Even to this day our political authorities have not provided for it, and denying us our title is denying us our right unheard. Spain would not have done so. (9 Peters, 712.)

Had the different governments succeeding to that of Spain established tribunals for the investigation and confirmation of this class of titles, and given notice of the consequences of

neglect, as was done by Moralez and the United States in the Louisiana and Florida titles, the case might, with reason, be held to be different, and within the rules laid down by the courts. This was not done, however, their governments believing (they being liberally disposed toward their citizens) that grantees should not be put to trouble or expense in securing confirmation of rights, already acquired and acquiesced in. (12 Peters, 446.)

There is a singular absence of all legislation in the least disparaging to land titles emanating from Spanish authority ; and while none will deny that the succeeding governments to Spain might have assumed the rights of the Crown to confirm or set aside these grants, the fact that they have not done so is conclusive of the fact that they did not desire to do so, and their very silence on this subject operates both in law and equity as a confirmation to a party in interest. On the 31st day of January, 1824, the Mexican nation, being the people of the vice royalty of New Spain, the captain-generalship of Yucatan, and the internal provinces of the West and East (among the latter of which was the province of Texas), by constitutive act assumed sovereign power (1 White's Rec., 374 *et seq*)., and, through their Sovereign General Constituent Congress, on the 18th August following, decreed the General Colonization Law (Schmidt's Civil Law Spain and Mexico, Appendix No. 5), the 2d Section of which is as follows :

" Son objeto de esta ley aquellos terrenos de la nacion, que " no siendo de propiedad particular, ni pertenecientes a corpor- " acion alguna o pueblo pueden ser colonizados." A fair translation is :

" The objects of this law are those national lands which, " not being special property, nor belonging to corporations or " towns, may be colonized."

The word " particular " is broad in its signification and embraces every character of right.

The clear intention of the Congress was not to disturb any grant or title to land previously made, no matter of what char-

acter.   The door for inquiry was closed—no tribunal was estab-
lished for the investigation of grants, or to which individuals
might apply to have their titles confirmed.

This law was never changed, and I maintain that it was a
confirmation by the sovereignty of all grants previously made,
otherwise the exceptions would not have been declared, particu-
larly as confirmation was not the act of making or extending
the title.   It only gave strength to it, or rendered it more cer-
tain.   It was simply an act of ratification, in which a party
placing itself in a position where it cannot ratify, is estopped
from taking advantage of the want of it—and, for the purposes
of this suit, Section 10 of General Provisions of the Constitu-
tion of the Republic of Texas was intended to confirm all
grants made, not tinctured with fraud, particularly when a
party is interrupted in his enjoyment by private individuals.
What right have they to assume the prerogatives of the Crown
of Spain and invoke the aid of our courts to disturb this right
of possession?   And where the law giving to them the right
to disaffirm these grants?   To hold that defendants may re-
cover in this suit is to hold that they have the rights of sov-
ereignty.   Under the law of the time the right could only be
questioned by the Crown, or by his authority, and it is respect-
fully submitted that the law is now the same, and if this grant
is to be set aside or held void, it must be at the suit of the
State, and not of individuals having no authority to repre-
sent it.

It is contended that this is an incipient or inchoate title.   I
cannot concur with this view, for the reason that an incipient
or inchoate title is one where the beginning steps have been
properly taken, as when a petition has been preferred, a refer-
ence made, and survey ordered and made, but stopping short
of the act of possession or granting act, or *habendum et ten-
endum* with the *testatum*.

It will not be contended that this title is deficient in any of
these requisites.   To all intents and purposes the grant is com-
plete for the purposes of its issuance.

But, for the sake of the argument, suppose I concede this to be an incipient or inchoate grant, we then find ourselves rightfully in and entitled to the possession by grant of the sovereign of the soil.  Then, where is the act of the sovereignty resuming the possession, or manifesting its desire to do so.  In any event, individuals are concluded.  The claim that it is an incipient grant is an admission that it is good as far as it goes, and this includes the fact and right of possession.  Who is to disturb it ?

It is also claimed that this is an *amparo ;* but certainly this will not be insisted upon, for an *amparo*, or protection, was only a police regulation to protect the party until he could take the incipient steps to procure a grant.  The granting of an amparo was no part of political duty or functions.

There is a moral obligation resting upon all governments to protect the rights of their humblest citizens, and not allow them to be trampled upon by the more powerful.  To admit the defense in this case would be a destruction of this principle.

It is clearly in evidence that Madam Duran believed she was the owner of this land, subject to the single contingency of opposition by the Intendente.  Her remaining in possession after the grant, making improvements, small to be sure for the present day, but considerable for the time ; her erecting and having dedicated a chapel to religious service, leaving a brother in charge when she went to Monclova, making disposition of it in her will, and that will verified by the same man who was Governor when she preferred her petition, he then holding a higher office—all show how she as a citizen and he as an officer looked upon it.  The facts in evidence that their cotemporaries looked upon it as a grant ; the action of the heirs in their several efforts to maintain possession ; and the recognition of the political authorities and ministerial officers of the time ; the fact that the survey was delineated on the county map, and respected by the locators and surveyors until a recent date, all amply show a public recognition of the right, and when taken

in connection with the other positions assumed, seem to me to place the title or right beyond question.

If, as Judge Catron says, in Menard's Heirs *v.* Massey, the grantee could not be expected to go in haste from Missouri to New Orleans to have his grant confirmed, on account of the small value of the land, the long distance, the attendant expense, and dangers by the way, much less would it be required of Madam Duran, an aged woman, to at that time go from San Antonio to San Luis Potosi for that purpose. And if the government afterward failed, neither she nor her heirs should be held responsible for it.

If it be true, that every case must, to some extent, stand upon its own facts, this case is one coming peculiarly within the rule. And the court is in error if it believes the title was only offered as the foundation for prescription. It was offered and admissible in evidence under the pleadings as a sufficient title for the purposes of the suit, as well as the foundation for presumption of a grant.

WALKER, J. In announcing the opinion at which we have arrived in this case, it would be unnecessary to follow, in their due order, the assignments of error. Most of the material questions presented for our consideration are saved on the bills of exception, some of which we will notice in their order.

As to the first, we think the defendants were entitled to a trial by jury. An agreement to submit to the court the law and the facts in the case, made ten years before the trial, and subsequent to which material changes were made in parties as well as in the *locus* of the trial, should not have been regarded as binding, and the cause should have been tried by a jury, if demanded.

Touching the matter contained in the second bill of exceptions, we think the court erred in overruling the motion to dismiss the intervention of Lee and wife, filed while the cause was pending in Hays county. If the first suit between these

parties, brought in 1847, must be regarded as an action of trespass to try title (11 Texas, 580), then the intervention of Lee and wife came too late, being four or five years after the termination of the first suit. Their intervention was, as to them, an original action.

As to the matter of the third bill of exceptions, we believe it incompetent, even under our very liberal system of practice and procedure, for any number of persons, holding several interests, to join in a common suit for the recovery of land where, if they recover at all, they must recover in severalty and in different parts of the whole tract claimed.

If the translation of the Spanish concession were offered by the plaintiffs below for that purpose, it was incompetent to prove a grant. It did not purport to be a copy of a grant, and by its very terms it forbade the presumption of a grant under it. This paper, in the attitude assumed by the pleadings, had no judicial standing in the case.

We think it was error to admit the declarations of Madam Duran in proof of her title, and to support the title of those claiming under her; nor was the will of Madam Duran competent evidence to prove her title.

These errors are sufficient to warrant the reversal of the judgment and the dismissal of the case; but we feel it our duty in this case to give other, if not stronger and better, reasons for the disposition we propose to make of the case.

A notice of the facts in the case becomes necessary, and it is somewhat difficult to understand what use the plaintiffs propose to make of the *amparo*, or concession, made to Dona Feliciana Duran Cubier for the land in controversy, dated in 1807. This paper, as before remarked, could have no judicial standing in the court. This court said in Paschal *v.* Perez, 7 Texas, 348, " It is no longer an open question that an imperfect title, ema- " nating from a former, and unrecognized by the existing, gov- " ernment, forms no foundation for an action." An inchoate or incipient title is imperfect, and requires some additional exercise of the granting power before a fee can pass under it;

it does not imply absolute dominion in the land either against the sovereign or against individuals.

The political power of the government may affirm or disaffirm ; and this is undoubtedly true under all changes of sovereignty which may occur, the successor not being bound by the incipient or imperfect acts of a preceding government, any farther than such government would be bound by its own acts.

But doubtless the theory of this case, as maintained by the plaintiffs, is, that they have proved a possession for such length of time as to raise the presumption of a confirmation of their otherwise inchoate title.

Before discussing the principles of law applicable to this theory, let us examine the leading facts in the case which may be considered as proven in a manner to satisfy a jury, if the cause had been tried to a jury.

First, then, the concession dates in 1807.   In 1808, Madame Duran established a ranche, cultivated a small portion of the land, and herded a few cattle, until 1812 or 1813, when war broke out, and the inhabitants of the country were disturbed in their peaceful pursuits, and Mrs. Duran with her family and servants took refuge in Mexico.   That in the year 1813 or 1814 she died at Monclova.

There is no evidence to show any occupation or possession of the land from 1813 to 1820.   In the latter year, the heirs of Madame Cubier made partition of the two leagues of land among themselves, as indicated by the map found in the record, the blue lines showing a division into five parts.   The unity of possession in this estate was thus broken, and the lands are still claimed in severalty by those claiming to hold under the Cubier grant, so-called.

There is evidence to show that in the year 1820 a brother of Mrs. Cubier occupied and cultivated some portion of the land ; but, for the twenty succeeding years, up to 1840, we find no reliable evidence in the record to satisfy us that the land was occupied or cultivated by any person, although there seems

to be some evidence that some portion of the land was occupied in 1834. In 1842, the witness Mancheca thinks he observed some cultivation upon the land, but the testimony of the witnesses Lewis and James renders the correctness of his memory doubtful.

In view of these facts, it does appear to us, when taken in connection with well-known historical facts, that there is very slender ground for the presumption of a grant from the Spanish government. The time from 1807 to 1813 or 1814 is the only time in which the Spanish Intendente at San Luis Potosi could have confirmed the grant to Madame Cubier, for in one of those years she died. In 1821 Mexico established her independence of the crown of Spain, and all persons holding possession of lands by inchoate grants issued subsequent to the year 1700, had to apply to the authorities under the new government for confirmation. (See Paschal v. Perez, 7 Texas, 370; 1 White's Recop., 64.)

But it is totally unnecessary to pursue this inquiry, inasmuch as the plaintiffs do not claim that the Cubier grant ever was confirmed, but rely upon the doctrine of occupation and prescription for title, which they claim has in their case become a necessary presumption; or, perhaps, it may be more correct to say that the plaintiffs claim a presumption of confirmation from lapse of time.

In the case of Paschal v. Perez, there was certainly a longer and better connected term of occupation proved than in the case at bar; and yet the Chief Justice (whose opinions in matters of this kind are to be venerated) used this language:—
" In relation to the presumption of confirmation by lapse of
" time, it is sufficient to say, to whatever extent this may be law-
" fully indulged in support of an actual occupation with claim of
" ownership, it cannot arise, at least until a much longer time
" has elapsed, from such acts of ownership as are proved in this
" case."

In a case between private individuals, and in relation to an incorporeal hereditament, the Supreme Court of the United

States held that a grant might be presumed after a lapse of thirty years' uninterrupted possession. (See 6 Peters, 498.) There is in this case a quotation from the law of Toro, by which it appears that prescription was of two kinds,—immemorial and temporal. The first might be proved by witnesses of good repute, who of their own knowledge could prove the possession for forty years, and who would say upon their oaths that they never heard their ancestors say anything to the contrary. This immemorial possession related to the seignory or dominion of towns and cities, and to the jurisdiction of courts, but could not run against the king's prerogative. (1 White's Rec., 95, Sections 10 to 21.)

But in the case of Paschal v. Perez this court, after referring to the regulation of October 15th, 1754, says that the regulation throughout shows that confirmation is necessary to perfect title, except in cases where possession has continued for not less than fifty-four years, and in such case title by prescription might be set up. Even this provision of the Spanish law, if such be the well-founded conclusion, violates the maxim "*nullum tempus occurrit rege*," to which our common law notions have hitherto inclined.

But we should feel great willingness to defer to the wisdom and learning of our predecessors on this bench, as expressed in Paul v. Perez, 7 Texas, 339 ; Herndon v. Casiano, 7 Texas, 323, and other cases, were it not that the opinions in these cases, as well as the opinion rendered in the case at bar, when before this court in 11 Texas, 579, have been so ably reviewed by our more immediate predecessors, in Biencourt v. Parker, 27 Texas, 558 ; Walker v. Hanks, ib., 535 ; Yancey v. Norris, ib., 40 ; and Watkins v. Taylor, 26 Texas, 688.

It cannot have escaped the notice of the profession that the latter cases have strongly inclined to a different rule. We of the present bench, in Forest v. Woodall, 33 Texas, 363, have adhered to the reasoning of Smith v. Power, 23 Texas, 29, and the later cases referred to.

In Biencourt v. Parker, Mr. Justice Moore, in a learned and

lucid opinion, says: "Although to some extent every case "must stand upon its own peculiar facts, the principles upon "which the courts are to be guided in the presumption of grants "may be said to be now well established by the former decis- "ions of this court. (Taylor v. Watkins, 26 Texas, 688; and "Yancey v. Norris, 27 Texas, 40.) The distinction, however, "between the presumption of a grant from the government, "of a part of the public domain, and of the intermediate links "in a chain of conveyance, has not been overlooked by the "court."

We think it not unlikely that courts have in some instances failed in the distinction necessary in the law of presumptions, between incorporeal hereditaments and the realty. By the English courts, it was long questioned whether the doctrine of presumption could be applied to land, and we are not sure that the later cases have changed the rule. In Doe v. Cook, 6 Bing., 174, Tindale, C. J., said: "that no case could be put "in which any presumption had been made, except where title "had been shown (by the party who invoked the presumption) "good in substance, but wanting some collateral matter neces- "sary to make it complete in point of form. In such case, "where the possession is known to have been consistent with "the fact to be presumed, and only in such cases, had the pre- "sumption ever been allowed." In Fenwick v. Reid, Abbot, C. J. strongly rebuked the plea for presumptions of grants and conveyances. In the same case Holroyd, J., said that even where rights of way depended on presumptions, evidence to rebut the presumption would be admissible. In Livett v. Wilson, 3 Bing., 64, Best, C. J., speaking of the law of pre- sumption in its application to easements and rights of way, said: "I do not dispute that if there had been an uninter- "rupted usage for twenty years, the jury might be authorized "to presume it originated in a deed; but a court would not "be authorized to instruct the jury that they *must* so find."

Very numerous cases are referred to, of similar import, in the appellants' briefs; none, perhaps, more applicable to

the case at bar than the case of Ballard *v.* Barksdale, 11 Iredell.

How, then, stands the case at bar? Possession, under an inchoate grant to Dona Feliciana Duran Cubier in 1808 continued about five years; partition of the lands among her heirs, in 1820; temporary and limited possession broken off for twenty years; the office of Intendente broken up in 1818 by the change of government, to whom the inchoate title by its own terms referred for confirmation.

Lest this opinion should be in anywise misunderstood, and improperly applied to cases coming under our limitation laws, we will here say that our ten years' limitation act is similar in character to the statute of 21 James I., Chapter 16, under which title may be gained by one individual against another by prescription under a lapse of twenty years; but neither the statute of James nor our own ten years' limitation law can give .title against the government. Before prescription can run under these laws, the government must part with the title, and then the statute may run. For the reasons given, the judgment in this case must be reversed and the cause dismissed.

Reversed and dismissed.