The Republic of Texas, Appellant, vs. Frost Thorn, Appellee — Appeal from Nacogdoches County.

After the passage of the national colonization law of the 13th August, 1824, the states of the Mexican confederation possessed the property in the soil, and had alone the power, by direct agency, of appropriating lands to individuals.

The approbation and consent of the supreme federal executive of Mexico is necessary to support a title for lands within the border leagues. [*Ante*, 241; 21 Tex. 97.]

In suits for the establishment of title to lands lying within the border leagues, brought under the act of the 9th January, 1841, the fact of the assent of the supreme national executive to the grant or claim must be specifically averred and proven, and cannot be proven unless alleged.

This action was instituted against the republic, to establish the validity of a claim to lands within the twenty border leagues, by virtue of authority derived from the act to quiet the land titles within that section of the country, approved January 9, 1841. [See Laws of 1841, p. 177.] The petition represents that Jose Ybarbo, for himself, and on behalf of his three brothers, applied, in the month of February, 1827, to the political chief of the department of Texas for a concession of certain parts of a tract of land mentioned in the memorial; that the land was situated in the settlement of Nacogdoches, but its special locality, from some omission, perhaps, in the transcript, is not altogether intelligible, though the averments are sufficient to show that a portion of the land was at the junction of the rivers Attoyac and Angelina, and was then occupied by the Ybarbos for grazing their cattle.

The political chief, on considering the petition, ordered the alcalde having jurisdiction of the place not to permit any other person to molest the Ybarbos in the peaceable possession of the lands; deferring further action until the commissioner of the state should act on the same by ordering a survey, and making a formal title for the said lands to Ybarbo and his brothers.

No other proceeding was had until March, 1833, when a second petition was presented by Ybarbo to the political chief of the then department of Bexar, reciting the former memorial

and the said order, and praying for a formal title to the lands mentioned in his first petition. This application and the accompanying documents were forwarded to the governor of the state, and were by him referred to the proper officer, that the merits, claims and qualifications of Ybarbo, touching the premises, be reported to him; which being done, the governor, by virtue of the legal power vested in him, and in conformity with the thirteenth article of the colonization law of the state, of the 28th of April, 1832, did concede and grant in sale to the said petitioner the lands solicited, provided the same were entirely vacant; and the alcalde of Nacogdoches was authorized to extend formal titles, and place the petitioner in possession of the said lands.

The petitioner further avers that, after the issuing of the said decree of the executive, he was duly constituted the legal attorney of the Ybarbos to have the said lands located, surveyed and formal titles procured for the same, and that by virtue of this authority, he, on the 2d of April, 1834, petitioned the alcalde of Nacogdoches for the appointment of a surveyor to survey the said lands, and that a formal title might be issued.

The appointment was made, the survey accomplished, and on the 5th of May, 1834, the alcalde by virtue of the order of the governor before mentioned, executed and delivered a full and complete title for the lands described in the survey.

It is then averred that the political chief, the governor, the surveyor and the alcalde, had and possessed full and ample power, under the constitution and laws of the state of Coahuila and Texas, and by virtue of their offices, to do and perform all and singular the acts alleged in the petition to have been done by them or either of them, and that all of said acts were done in good faith.

It is further stated that the consent of the empresario, Zavalla, to the location of the lands within the limits of his colony, was obtained; that all the government dues on the said lands have been paid, and that all the stipulations contained in the said grant, or in the law concerning the premises, have been

fully complied with by the grantees, and that the petitioner is now the owner of the said lands. He prayed that the claim might be adjudged to be valid, and that he might be quieted in the possession and enjoyment of the same.

No answer was filed by the district attorney. The cause was tried before a jury, and a verdict being found for the plaintiff, the claim was adjudged to be established against the republic. An appeal was accordingly taken.

HARRIS, Attorney General, for appellant.

In this cause we labor under the disadvantage of having no bill of exceptions and no statement of facts.

But conceding that, upon the trial of the cause in the district court, the plaintiff there proved all that is contained in his petition, we contend that still he could not recover. For the petition shows that the claim to land arose prior to the 17th day of March, 1836; that the land is situated within the twenty border leagues fronting upon the line of the United States, and does not show or allege that his pretended title ever received the approval of the national executive of the Mexican government. [See the Laws of Coahuila and Texas, 192, art. 25; see, also, 1 White's Recopilacion, 601.]

Petitioner says it is shown that this tract of land is situated and located in the colony of the empresario, Lorenzo de Zavalla, and that the said empresario consented and agreed that the said land should be located within the bounds of the said colony.

This does not cure the defect in the petition, resulting from a failure to allege that a settlement or grant was made with the approval of the national executive. For the petition does not allege that Zavalla was authorized to establish that colony by the consent or with the approval of the national government or national executive. And, had this been done, the petition would still have been insufficient. For this would only have given *him* the right to *grant* lands to *colonists* and *settlers*, while the petition says it shows that, on the 22d of August, 1833, the *governor* did concede and grant *in sale* the said land, etc.

These distinctions are, with confidence, relied upon to sustain the position that the defects of the petition are not even aided by its being said to be shown that the empresario consented and agreed that this tract might be located within the bounds of his colony.

It may be remarked that the decree of the governor does not purport to be an absolute sale, but this was upon the condition that the land was entirely vacant. It does not appear that by him there was any subsequent confirmation of it.

The 13th section of the act of 1832 [Laws of Coahuila and Texas, 190], under which this sale purports to have been made, authorizes the *governor* only to sell lands. And taking this section with the 25th of the same act, he could sell only such lands as were not included within the twenty border leagues. The latter could not be sold or appropriated without the "approval of the national executive."

But if the law had given to the governor the power of selling the vacant lands within the twenty border leagues, that would not have given to him the power to delegate to an alcalde the authority to judge what lands were vacant, to sell them and to make titles to them. Had the law contemplated that all these privileges might be exercised by the alcalde, it would doubtless, in the first instance, have delegated to him that power.

It will be seen that before the survey and issuance of the title by the alcalde, the act under which they purport to have been made, viz.: the colonization law of 1832, was repealed by the act of 1834 [Laws of Coahuila and Texas, 251, art. 29], so that, if the survey and title would have been otherwise valid, this would have rendered them void.

And before the petition pretends that there was a title or a survey, decree No. 272 repealed all former laws on the subject of the distribution of the public lands, and required that they should be disposed of only at public auction, after a survey and advertisement for three months. [Laws of Coahuila and Texas, 247, articles from 1 to 6, inclusive.] There was no compliance with the requisitions of this law.

Now, there can be no legal or reasonable presumption that the plaintiff proved more upon the trial of the cause in the district court than he had alleged in his petition. The plaintiff and his counsel well knew that whatever was necessary to be proven was necessary to be alleged, and experience shows that plaintiffs are usually sufficiently prodigal in regard to allegations. For it often times happens that it is far easier to allege facts than to prove them. And to presume that more was proven than was alleged would be to presume that the court and the counsel for the republic permitted illegal testimony to be introduced upon the trial in the district court, and that the whole proceedings were in direct opposition to the plainest principles of the law. This view is sustained by what was said and decided by this court in the cases of Burton vs. Anderson, Texas R. 97, and Mims vs. Mitchell, id. 447. In the latter case an opinion of Judge Story is referred to, which is directly in point, and is as follows: "The proofs must be according to the allegations of the parties; and if proofs go to matters not within the allegations, the court cannot judicially act upon them as a ground for its decision, for the pleadings do not put them in contestation. The *allegata* and *probata* must reciprocally meet and conform to each other." [Harrison vs. Nixon, 9 Peters' R. 503.]

Now, since the whole merits of the cause as contained in the petition are before this court, and since we contend (and think successfully), not only from the want of sufficient allegations but also from those which are made, that the title of the appellee to the land in controversy is incurably defective, it is most respectfully submitted that this cause be reversed and finally determined.

Ardrey on the same side.

Webb for appellee.

Mr. Chief Justice Hemphill, after stating the facts, delivered the opinion of the court.

No bills of exceptions having been preserved in this cause, and no statement of facts being sent up with the record, the only question for consideration is, whether the judgment can be sustained, admitting that all the facts which, under the

allegations, could be legally proven in a suit of this character,. have been fully established and found to be true by the verdict of the jury.

It was contended in the argument for the appellee that the judgment was erroneous, and should be reversed, on the ground that the approval of the federal government was essential to the validity of the title, and that this, not being alleged in the petition, cannot be presumed to have been proven.

The consideration of the point raised will naturally involve two principal inquiries: 1st. Whether the approbation of the supreme federal executive is necessary to support a title for lands within the border leagues. 2d. Whether proof of this fact, if deemed essential, can be presumed to have been introduced under the allegations of the petition.

In the discussions which have arisen on the first inquiry, the respective powers of the federal and state governments over the public domain lying within the limits of a state have, in some of the causes before the court, been investigated with elaborate research.

I shall not attempt to follow the argument in all its latitude,. or to define, with precision, the limits of the rights and powers of the federal and state governments, respectively, over the public lands. But as the subject has been much discussed, I shall consider it to some extent in connection with the special inquiry under examination.

That the right of eminent domain over the public lands was originally vested in the federal government of Mexico is, perhaps, not now subject to question.

The confederacy of the Mexican states was not formed, originally, by a constitutional compact between several separate independent states, nor by a grant of powers originally vested in the several provinces which afterwards constituted the states of the union.

The public lands of the United States of the North, before the acquisition of Louisiana and Florida, belonged originally to the several states, and became federal property by purchase or voluntary cession from the states.

But in the Mexican union the general government claimed,

originally, the property in the public domain. It is true that, under former governments, the provincial authority had exercised certain powers of control over the public lands, but this was in subordination to the central or supreme authority of the country, whether vested in the crown, or represented by the vice royalty of New Spain, or the sovereign provisions governing juntas, in the Emperor Iturbide, or the other authorities which succeeded, before the assemblage of the constituent congress which finally adopted the federal system, and out of the municipal subdivisions of the territory formed the states of the confederation.

It will not be material, however, to prosecute an inquiry into rights which might, perhaps, be claimed for a state on the ground of its constituting an integral part of the government existing previous to the confederacy, or on any other ground, except the power derived from the national colonization laws of the 18th August, 1824, the authority of which was recognized by the state of Coahuila and Texas; nor did she evince, until a late period of her existence, if ever, that she claimed any right or control over the public lands, except such as was conceded to her by virtue of the national law to which we have referred. By this law, all the vacant lands of the nation were declared subject to colonization, and the states were authorized to form colonization laws or regulations for their respective states in conformity with the constitutive act, the general constitution, and the regulations of the national colonization law. The power of disposing of the public lands, or of appropriating any portion of them to the uses and purposes of the federal government, except so much as might be necessary for the erection of warehouses, was relinquished and ceded to the states — the general government, for colonization purposes, retaining control only over such lands as lay within the territories of the republic. But though the immediate and direct agency, in the distribution of the public lands, was vested in the states, yet the grant was subject to certain reservations and exceptions embodied in the law containing the authority.

Colonization in the border and littoral leagues was prohib-

ited without the previous approbation of the general supreme executive power; and the power of prohibiting the entrance of foreigners, and to take such precautionary means, with respect to foreigners who came to colonize, as were necessary to the security of the confederation, was reserved to the general government. Mexican citizens were to be preferred; not more than eleven leagues were to be united in the same hands, and residence in the republic was necessary to retain property in the lands granted, etc.

The state, on the 24th of March, 1825, adopted a colonization law in strict conformity with the law of the nation, and until 1830 the general government did not attempt to embarrass the operations of the state under her colonization laws; but the policy of the federal government then changed, and seizing on the reservation in the 7th article in the law of 1824 as a pretext through which the further settlement of Texas could, in a great measure, be prevented, she prohibited by law of the 6th April, 1830, foreigners, residents of the coterminous nations, from being received as colonists, and suspended all contracts in opposition to this inhibition. [Colln. Decretos, 1829, 30, p. 101.]

There was no pretense, however, on the part of the federal government, that she could, by her own agency, colonize lands lying within the limits of a state, without a previous purchase from, and a consequent assent of, the state authorities.

Commissioners were directed to make such purchase from the states that colonies of Mexicans and of foreigners, not citizens of nations bordering on Mexico, might be formed; but the property in the soil is virtually acknowledged to be in the states, and we know, from history, that under this law the Mexican government attempted, or intended, the establishment of colonies at Tenoxtillan, on the Brazos, Galveston, and at other places, and that the state authorities insisted upon the federal government complying fully with terms and stipulations similar to those exacted in all other contracts for colonization.

The subordinate military authorities attempted some interference with the officers of the state, in reference especially to

the border and coast leagues, but there was no assumption that the lands, in any part of the territory of the state, could be granted directly by the government of the confederacy.

The obnoxious article of the law of the 6th of April, 1830, prohibiting the ingress of foreigners from bordering nations, was repealed on the 21st of November, 1833 [Colln. Decretos, 33, 34 and 35, p. 74], and, although various powers are, by the same act, conferred on the executive, in respect to colonization, yet they relate to lands lying within the territory, and other vacant lands over which the federal government may have power, which could only be acquired by purchase from the states. Up to this period, the laws of the state, for the disposition of the public lands, were in strict conformity with the national law regulating the subject, but some of the subsequent acts of the state are of more doubtful character; for though, perhaps, with one or two exceptions, they are not directly opposed to any of the provisions of the national law, yet they are certainly wide departures from the various laws of the state on the subject of colonization.

By decree 26th March, 1834 [No. 272, p. 247, Laws C. and T.], all the vacant lands of the state are directed to be sold at public auction; and by decree No. 278, p. 270, 19th April, 1834, the executive was authorized to dispose of four hundred leagues for remunerating the services of the militia in the warfare against the savages. On the 7th of May, 1834, by decree No. 287, p. 276, the laws in relation to the sale of vacant lands were dispensed with, until the executive, in manner and on terms advantageous to the state, might negotiate with the president for such lands as might be needed by the federal government.

Whether these laws were considered by the federal government as contrary to the constitution or the general law of colonization, I have no means of ascertaining. They at least were not annulled by that government, as was, at a subsequent period, one of the decrees of the state disposing of the public lands.

The decree of the general government of the 4th February, 1834, p. 280, laws of 1833–34–35, in relation to the colonization

of the lands of Coahuila and Texas, deserves a passing notice, as it has been contended that this was an assertion, by that government, of the right of dominion over lands within the state.

It will be seen, however, that the vice president claims no other powers than such as are derived from the law of the 6th April, 1830, and this authorizes the purchase by the federation of lands from the state, for the purposes of colonization; consequently the law of 1834 cannot be regarded as an attempted resumption of the rights possessed by the general government previous to the colonization law of 18th August, 1824. Recurring again to the legislation of the state, we find, by decree No. 293, p. 281, Laws C. and T., the executive is authorized to alienate four hundred leagues of land, which decree was, by the general government, annulled on the 25th of April, 1835, as being in contravention of the law of 18th August, 1824.

This may have been an exercise of the constitutional functions of that body, and it was afterwards ratified by the convention of Texas; but the federal government, in the same decree, assumed, by virtue of the 7th article of the law of the 18th August, 1824, to prohibit the littoral and bordering states from disposing of their vacant lands for the purposes of colonization until regulations should be established to be observed in said colonization. This was an attempted exercise of arbitrary authority, not warranted by the 7th article of the law cited, nor by any of the constitutional powers of the general congress.

The introduction of foreigners of a particular nation might have been prohibited, but the general powers of the state over the public lands, for the purposes of colonization, could not be suspended. In the 3d article of the decree, the general government, in the same usurping spirit, prohibited the said states from disposing or selling any part of their vacant lands without the previous approbation of the general government, which, in all cases, should be the preferred purchaser; and, by virtue of the articles three and four of the law of 6th April, 1830, she offered to purchase the four hundred leagues, the sale of which had been decreed by the state.

From a review of these laws on the subject of colonization,

it will appear that extensive authority over the public lands, generally, was vested in the state; that she possessed the property in the soil, and had alone the power by direct agency of appropriating lands to individuals; that this power was never assumed by the general government during the existence of the confederacy, but its exercise by the state could be, to some extent, paralyzed by virtue of faculties reserved in the general law of colonization, and that, in fact, after 1830, the operations of colonization were, from that cause, much embarrassed and retarded. But no attempt was made to effect an entire suspension of the power of the states over the public lands, until the law of the 25th April, 1835, when, by an arbitrary perversion of the 7th article of the law of 1824, the congress assumed the power of prohibiting further sales of land for colonization, until regulations should be made by which such colonization should be controlled.

These regulations were, doubtless, to emanate from the general government, and if so, would have been unwarranted usurpation of a power which had been relinquished, and could not be resumed at the pleasure of the federal authorities.

Having disposed of the objections that have been frequently urged against some provisions of the early legislation of the state of Coahuila and Texas, in the exercise of her powers over the lands of the state generally, I proceed to the special inquiry whether the grant in question could be lawfully made by the state authorities within the twenty frontier leagues, without the previous approbation of the executive of the federal union.

There can be no doubt that the property in the soil of the public lands, in that territory, was vested in the state, and that grants to individuals could emanate alone from her lawful authorities; but, for purposes deemed essential to the national security and welfare, the state, in the original grant of the power, was prohibited from the disposition of any such land without the approbation of the federal executive; thus rendering the concurrence of both goverments essential to the validity of a grant.

The title could issue alone from an officer of the state, but the approval of the president was an essential constituent of his power, and without which this portion of the public domain could not be rightfully appropriated. This condition in restraint of the general power of the state over the public lands was sanctioned and enforced by provisions in the state laws of colonization of March, 1825, and April, 1832, and in the commissioner's instructions of September, 1827. [See 7th and 47th articles of Decree No. 16, p. 16; Art. 5 of Instructions, p. 71, and Art. 25 of Decree No. 192, p. 192, Laws C. and T.]

This title was issued by virtue of the law of 1832; and by the terms of that, as well as by those of the national decree, the approbation of the president was essential to its validity.

This has been already decided at this term of the court, in the case of Goode vs. McQueen's Heirs; and it was also held, at least in effect, that the party claiming under the grant must affirmatively show that this approbation had been received.

The question, then, presents itself, whether, under the allegations of this petition, this proof can be presumed to have been introduced?

In ordinary suits between individuals claiming lands within the border or coast leagues, under titles emanating from the commissioner of a colony, the allegation of the approval of the federal executive would be unnecessary, and need not be proven unless denied by the opposite party. This assent, if given at all, would be attached to the contract with the empresario, and would rarely, or perhaps never, appear upon the face of the title of the colonist; and, in suits of this character, that is between individuals on claims by purchase, if there be only the general allegation that the title emanated from the proper authorities of the state, this would be sufficient to support the action, and authorize the admission of evidence, to show the title had been issued with the previous assent of the federal authority.

But in this latter class of cases, where there is no presumption that, as a class, they have been approved by a general

order (as is the fact with titles under an empresario contract), if the claimant attempts to specify all the proceedings in relation to the issue of the title and preliminary thereto, the presumption arises that all the facts have been stated, and that one so essentially affecting the power of the officer as the approbation of the general government, would not, if it existed, be omitted; and where that is the case the defect is fatal, and the action cannot be maintained.

But this is a suit, not between individuals, but against the republic, by authority of a special statute, which was founded upon a supposition arising from an investigation of facts by the legislature, that the claims to lands, prior to the 17th March, 1836, within the frontier leagues, were contrary to law, and in *their origin*, for the most part, absolutely fraudulent and void.

This recital in the preamble of the statute does not affect the validity of the claims; but it should, especially when taken in connection with the subsequent portions of the enactment, induce the court to require the applicant, in setting out the grounds of his claim, to specifically allege all such facts as would not only show the validity of the title, but repel any presumption that the location could have been *contrary* to law and void in its origin. Now, that the claim should be in conformity with law, the assent of the general government was an indispensable requisite, as well under the national as state colonization law, by authority of which the concession was made. This is not only not alleged, but the history of the title, from its inception to the final grant, is detailed with such minuteness, that the presumption, even in an ordinary suit, would be against the existence of the fact of the assent, or that it was proven at the trial.

The petition describes, with special detail, the action of the executive, his reference of the application and the accompanying documents to the proper officer, that the merits, claims and qualifications of the grantee might be ascertained; and it is averred that on the report, the executive, by virtue of the legal power in him vested, and in conformity with the thirtenth article of the law of the 28th April, 1832, granted in sale the said land to the petitioner.

There is no intimation that the application was passed to the president, or that his approbation was received through the channel of the state executive, or in any other mode. Nor is there any allegation other than those usually made in describing the acts of the granting authority when titles are issued to land lying without the limits of the border leagues. There being no statement of facts, the presumption of law in favor of the verdict and judgment is, that all such facts as could be legitimately proven under the pleadings were established; but this does not extend to such as either could not have been legally established, or, by no reasonable presumption, could be supposed to have been proven under the allegations.

We are of opinion that, in suits for the establishment of title under the statute, the fact of the assent of the supreme national executive being essential by both the laws of the union and of the state to the support of the claim, must be specifically averred, and cannot be proven unless alleged; and that the defect would not only be fatal on demurrer, but is not cured by verdict, and may be taken advantage of on error.

This is the general rule; and if a claimant supposes that his title could be validated, independent of the assent of the general government, by virtue of any law of the state conflicting with the national colonization law, and not abrogated by the constitution of the republic of Texas (if there be in fact any such law), it should be specially referred to, that the question for determination thence arising might be distinctly presented. In this case there can be no pretense for exception to the general rule of pleading, as the approval of the national executive was required by the state law of colonization of the 28th April, 1832, under which the title was issued.

Another objection has been taken to the grant as it appears on the record, and it is this: that the alcalde, at the date of the execution of the title, had no authority to act under the decree of the governor requiring him to extend the deed of possession. The land was ceded under the law of 1832, and the alcalde of Nacogdoches, in 1833, was authorized to issue title; but before a survey and deed of the lands was made, the law of 1832 was repealed by the law of 26th March, 1834; and it is

suggested that the alcalde's authority was revoked and an-nulled by the repeal of the law, and that he had no rightful power to act on a commission issuing previously to the date of the repeal.

The survey was made in April, and the title issued on the 5th of May, 1834, but a few days more than a month after the repealing decree, and it might be contended that the law had not been published, and was not in force at that date, in the department of Nacogdoches. As it is not important that this objection should now be decided, and it has not been fully argued, we refrain from expressing any opinion on a question of so much importance, and which so radically affects the legality of this, and perhaps many other titles. The judgment is reversed and remanded, with leave to the parties to amend their plead-ings, and that such further proceedings be had as may be in conformity with this opinion and with law; and should the plaintiff not amend his petition at the first term of the district court after the mandate is received, it is ordered that the cause be dismissed.

The judgment entered in this cause upon the foregoing opinion was subsequently modified by the following amend-ment, to wit:

"Since the entry of the judgment in this case, suggestion has been made that there is no probability that the claim can be established on the principles and according to the rules pre-scribed in the opinion; and the counsel for the appellee having expressed no desire that the cause be remanded, it is ordered that the entry be so reformed as to read, 'that the judgment of the court below be reversed, and the cause dismissed.'"