STATE v. PALACIOS et al.

(Court of Civil Appeals of Texas. Austin. June 29, 1912. On Motion for Rehearing, Oct. 16, 1912.)

1. PUBLIC LANDS (§ 197*)—TITLE—IMPERFECT TITLE.

An imperfect title to public land emanating from a former government, and never recognized by the existing government, forms no foundation for an action or defense.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 624, 638; Dec. Dig. § 197.*]

2. PUBLIC LANDS (§ 210*)—MEXICAN GRANTS—VERIFICATION—REQUISITES.

A grant of land from a Mexican state executed in 1835 is complete without a certificate as to the genuineness of the signatures to the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 659–665, 704; Dec. Dig. § 210.*]

3. PUBLIC LANDS (§ 199*)—MEXICAN GRANTS—VALIDITY.

The act of the Mexican Congress of October 3, 1835, and accompanying regulations issued by the president ad interim, which provide that, until the attributes of the government and departmental boards in what relates to the treasury are declared by law, the governors shall make no sales of lands without the previous approval of the supreme government, do not deprive the governor of the previously existing power to sell public lands, but merely indicate under what circumstances the recognized power shall be exercised.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 625–633, 638; Dec. Dig. § 199.*]

4. PUBLIC LANDS (§ 203*)—MEXICAN GRANTS—VALIDITY.

The regulations accompanying the act of the Mexican Congress of October 3, 1835, providing that, until the attributes of the government and departmental boards in what relates to the treasury are declared by law, the governors shall make no sales of lands without the previous approval of the supreme government, did not become binding on the governors until received by them, and to sustain a grant made by a governor October 15, 1835, the court will presume that the regulations had not been received at the time of the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 638–648; Dec. Dig. § 203.*]

5. PRINCIPAL AND AGENT (§ 151*)—POWER OF AGENT—RESTRICTIONS.

Where an agent is given authority to do certain acts, and thereafter the principal notifies him not to do such acts without previously submitting the matter to the principal and receiving his approval, an act of the agent in conformity with the original power prior to the receiving of the notice limiting his power is binding on the principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 564–566; Dec. Dig. § 151.*]

6. EVIDENCE (§ 65*)—PRESUMPTIONS—KNOWLEDGE OF LAW—KNOWLEDGE OF REGULATIONS.

Though every one is presumed to know the law as soon as a law is passed, there is no such presumption as to instructions given by heads of departments, or by the governor or president as to regulations formulated for carrying a law into effect.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 85; Dec. Dig. § 65.*]

**7. EVIDENCE (§ 83\*) — PRESUMPTIONS — PERFORMANCE OF OFFICIAL DUTY.**

One alleging that an officer has violated his instructions must show a violation and must show that the instructions were received, and the court will require full proof that the officer has exceeded his powers before it will so determine.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.\*]

**8. PUBLIC LANDS (§ 199\*) — GRANTS — VALIDITY — PRESUMPTIONS.**

Where a purchaser of public land of a Mexican state acquired as early as September 15, 1835, such an equitable title to land as ought in good conscience to be recognized by the government of Mexico, though thereafter withdrawing her public lands from sale, the act of the Mexican Congress of October 3, 1835, and regulations accompanying the act, providing that governors shall make no sales without previous approval of the supreme government, did not prohibit a grant by the governor to such purchaser.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 625–633, 638; Dec. Dig. § 199.\*]

**9. PUBLIC LANDS (§ 199\*) — MEXICAN PUBLIC LANDS.**

Mexico, on attaining her independence from Spain, became the owner, by virtue of the right of eminent domain, of all the public land within her boundaries, and she could cede them to the states subsequently formed under the Mexican Constitution of 1824, and the Mexican Constitution made the states competent to receive title to the public lands within their boundaries, and, on title vesting in the states, they could dispose of them as they saw proper, not inimical to the public policy of the federal government as declared by statutes.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 625–633, 638; Dec. Dig. § 199.\*]

**10. BOUNDARIES (§ 3\*) — CONFLICTING CALLS.**

Where different calls in grants of public lands lead to conflicting results, preference must be given to the calls which most probably indicate the intention of the government, as expressed in the face of the grant, read in the light of the surrounding circumstances.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.\*]

**11. BOUNDARIES (§ 54\*) — FIELD NOTES — INTENTION OF GRANTOR.**

Where there is an actual survey of public land granted, and the field notes of the survey are expressed in the grant, it is conclusively presumed that the government intended to convey the land embraced in the survey, and the court in determining the land granted must follow the footsteps of the original surveyor.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 263, 268–277; Dec. Dig. § 54.\*]

**12. BOUNDARIES (§ 3\*) — FIELD NOTES — INTENTION OF GRANTOR.**

Where two calls descriptive of a line or corner in a grant of public land lead to different results, as where the call is to run from a given point a certain course and distance to another point, and such other point will not be reached by running the course and distance, it is presumed that one or the other of the calls was inserted by mistake, and the mistaken call must be disregarded, and the object of rules relative to the comparative dignity of calls is to ascertain which of contradictory calls are the mistaken ones.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.\*]

**13. BOUNDARIES (§ 10\*) — SURVEYS — "FIELD NOTES."**

The term "field notes" in its ordinary sense means the notes made by the surveyor in the field while making a survey, describing by course and distance, and by natural or artificial marks found or made by him, where he ran the lines and made the corners.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. § 10.\*]

**14. BOUNDARIES (§ 25\*) — CALLS — PRIOR SURVEYS.**

The weight to be given to a call for a line or corner of a senior survey in determining the land included in a junior survey depends on whether the lines or corners of the senior survey were probably known to the surveyor at the time of the junior survey.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 137; Dec. Dig. § 25.\*]

**15. BOUNDARIES (§ 10\*) — CALLS — MONUMENTS.**

The court will attach considerable importance to a call in a grant of a Mexican state for stone monuments in the field notes where the law of the state required corners to be erected of quarried rock and lime mortar.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. § 10.\*]

**16. BOUNDARIES (§ 54\*) — PRESUMPTIONS — ACTS OF SURVEYOR GENERAL.**

In the absence of proof to the contrary, direct or circumstantial, the presumption is that the surveyor general of a Mexican state made a survey on the ground of a grant made by the state.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 263, 268–277; Dec. Dig. § 54.\*]

**17. BOUNDARIES (§ 54\*) — CALLS — SURVEYS.**

Where a grant made by a Mexican state was entirely surrounded by prior grants, the corners of which were required by law to be marked by permanent stone monuments, and the surveys of the prior grants had been recently made, and no bearing trees were given, though the subsequent field notes made by the state showed that at most of the corners there was timber for bearing trees and the distances to the streams shown on the map were not given, the circumstances showed that the survey of the junior grant was an office survey, and that it was the intention of the surveyor to extend the junior grant to boundaries of the surrounding grants where the calls in the junior grant were for corners of the senior grants.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 263, 268–277; Dec. Dig. § 54.\*]

On Motion for Rehearing.

**18. BOUNDARIES (§ 10\*) — GRANTS — ATTACHED MAP — EFFECT.**

Where a map attached to the grant of a Mexican state has letters on it which, without any explanation, are meaningless, but under the map in the original grant is an explanation of the same, made by the surveyor general, showing that the letters indicate the boundaries of surrounding surveys, the explanation indorsed on the map is a part thereof.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. § 10.\*]

**19. PUBLIC LANDS (§ 223\*) — GRANTS — ESTOPPEL.**

Where a claimant under a grant of a Mexican state and those under whom he claimed had nothing to do with the granting of a patent by Texas, or the making of a survey by virtue of which a patent was issued, but it appeared that they claimed the land included in the patent as a part of a grant of the Mexican state and lived thereon, the correctness of the Texas patent was not acquiesced

in, and the claimant was not estopped from relying on the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 705–719, 721–725; Dec. Dig. § 223.*]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by the State against Julian Palacios and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Jewell P. Lightfoot, Atty. Gen., E. B. Robertson, John W. Brady, and John L. Terrell, Asst. Attys. Gen., for the State. James B. Wells, of Brownsville, and E. Cartledge, of Austin, for appellees.

### Findings of Fact.

JENKINS, J. The appellant brought suit in the district court of Travis county for a tract of about 1,770 acres of land in Duval county, described as follows: Beginning at the northeast corner of a grant of land in the name of Rafael Ramirez, called San Pedro de Charco Redondo, in the southeast boundary line of a grant in the name of the heirs of Andres Garcia, called San Andres; thence east, about 2,178 varas, with the south boundary line of the San Andres, to its southeast corner, as patented, in the west boundary line of a grant of land in the name of the heirs of Jose Antonio Gonzales, called "La Huerta," patented June 3, 1869; thence south, 3,750 varas, with the west boundary line of said La Huerta grant to the north boundary line of a 160-acre survey No. 29; thence west, 414 varas, to the northwest corner of said survey No. 29; thence south, about 825 varas, with the west boundary line of 29, to the northeast corner of survey No. 28; thence west, 985 varas, to the northwest corner of same in the east boundary of No. 27; thence north, 188 varas, to the northwest corner of No. 27; thence west, about 922 varas, to northwest corner of same in the east boundary line of said Ramirez grant; thence north 3 degrees east about 4,400 varas, to the place of beginning.

Appellees claimed this land under a grant from the state of Tamaulipas, as follows:

"Inasmuch as the Citizen Jose Antonio Gonzales, resident of the town of Camargo, denounced pasture land at the place called La Huerta, being in that same jurisdiction, and the proceedings which the colonization law marks out having been carried out, as is evident from the document formulated to that effect, having paid to the public treasury the sum of forty six dollars, one real, eleven grains, in which was justly appraised four and one-half leagues of pasture land for large cattle, three labors and one hundred and twenty five thousand square varas, contained in its area; I, Jose Antonio Fernandez Ysaguirre, constitutional governor ad interim of the state of Tamaulipas, have decided to adjudicate and grant to said Citizen Jose Antonio Gonzales the mentioned pasture land for large cattle, which is also fixed under the corners and boundaries set forth in the attached map, verified with the seal of this government, and paraphed by my secretary.

"In virtue of which I confer upon the interested party full dominion and ownership in said land for him and his children (hijos) and successors (successores) and command all of the authorities and inhabitants of this state to have, hold and recognize the said Citizen Jose Antonio Gonzales as the lawful lord and owner of the said leagues for large cattle which are granted to him, and to this end, the judge of the said town of Camargo shall place the interested party in legal possession of them, previously citing the adjoining landowners, noting the same at the foot of this title for due evidence and preserving in the archives of his office a certified copy of the act of possession which he may make.

"Given in the city of Victoria, capital of the state of Tamaulipas, the fifteenth day of the month of October of the year one thousand eight hundred and thirty-five, twelfth of the installation of the Congress of this state.          Jose Antonio Fernandez.

"Francisco Villasenor, Secretary.

"Pasture land of La Huerta, surveyed for Mr. Antonio Gonzales.

"The foregoing octagon includes between its eight irregular sides four and one-half sitios of pasture land for large cattle, three labors and one hundred and twenty-five thousand square varas defined with the following bounds:

"A. Boundary of San Antonio of Las Anacuas.

"B. Boundary of La Temeridad.

"C. Boundary of San Juan.

"D. Boundary of Los Falcones (the Falcons).

"MI. Boundary of the pasture lands of Concepcion.

"H. Boundary of Rafael Ramirez.

"G. Boundary of San Juan del Mesquital (San Juan of the mesquite thicket).

"OP. Branch of Los Indios.

"NG. Arroyo of Agua Poquita (Agua Poquita creek).

"The pasture land joins on the north with that of Las Anacuas; on the west with that of San Andres and Mr. Rafael Ramirez; on the south with that of Concepcion and the Falcons; and on the east with that of El Senor de la Carrera.

"The survey was made in the directions which the plan shows, after correcting the variation of ten degrees which the compass has in these lands.

"Camargo, September 15, 1835.

"Licentiate Antonio Canalés."

It will be seen that said grant directs the judge of the town of Camargo to place said Gonzales in possession. Attached to said grant and a part thereof is the statement of said judge that on the 1st day of December, 1835, he placed the said Gonzales in possession of said land, reciting all of the particulars usual in such cases, among other things stating that he notified the owners of the adjoining lands, and went upon the land, and, taking said Gonzales by the hand and leading him about said land, placed him in juridical possession of the same in accordance with decree of his excellency the governor of date October 15, 1835; and further reciting that said Gonzales "gave most profound thanks to the supreme government, and in token of dominion and ownership which he acquired in said land, he poured water, cut grass, pulled up weeds and threw to the four winds, saying to the bystanders: 'Citizens, be you my witnesses that Citizen Matias Ramirez, constitutional judge of the town of Camargo and its jurisdiction, has placed me in juridical possession,' etc." Attached to this grant is the certificate of Jose Maria Garcia Villereal, constitutional judge of the town of Camargo and its jurisdiction, as to the authenticity of the signature of Matias Ramirez, former constitutional judge of said town, given "at the verbal request of Citizen Antonio Gonzales of this vicinity for legal uses which are fitting. This document is delivered him in said town of Camargo, the 10th of the month of October, one thousand eight hundred and forty-eight." Also a certificate from Joaquin Arguelles, notary public, that Antonio Fernandez y Zaguerre was constitutional governor ad interim of the state of Tamaulipas "in the period in which he verified it," and that Francisco Villereal was secretary at said time; also that Antonio Canales was at said time surveyor general of said state; also that Jose M. G. Villereal was the constitutional judge of the town of Camargo in 1848. To this is attached the certificate of the United States consul at Matamoras that Joaquin Arguelles was notary public in and for the city and port of Matamoras.

Appellant calls attention to the fact that the grant is signed by "Jose Antonio Fernandez," and that the certificate of the notary gives the name of said governor as "Antonio Fernandez y Zaguerre." The latter signifies the mother's family name. It is not uncommon for men to be so called in Spanish speaking countries. It will be noted that in the certificate of said notary he states that Antonio Fernandez y Zaguerre is the party who authenticated the title, and that the signatures of all the parties signing said grants "are the same which they used and are accustomed to use in all their public acts, and ought as such to be given entire faith and credit to the said preceding title and instruments which follow it." On June 3, 1869, the state of Texas issued a patent to the heirs of Jose Antonio Gonzales to a tract of land in Duval county on the Concepcion and Agua Poquita creeks, known as La Huerta on the map of said county; "it being the quantity of land to which he is entitled by virtue of a grant from the state of Tamaulipas to the said Gonzales, dated the 15th day of October, 1835." Beginning at the southwest corner of survey in the name of Vicente Ynojosa and called Las Anacuas, this being the original landmark designated on the map as San Antonio de las Anacuas; thence south 10,000 varas; thence west 1,355 varas; thence south 5,800 varas, crossing Agua Poquita creek, 6,944 varas post and stone mound in north line of Francisco Cordente, called Santa Cruz de la Concepcion; thence south 80 degrees east with said survey, 6,335 varas, to northeast corner of same, a post and stone block on the west boundary line of Juan Jose Manuel de la Garza Falcon survey, called San Francisco, this being the corner designated in the original survey as San Amador; thence north 10 degrees east with Falcon's line, 2,040 varas, to cross Concepcion creek at 5,000 varas its northwest corner; thence south 80 degrees east with the north boundary line of said Falcon, 1,770 varas, to the southwest corner of a survey in the name of Dionisio Elizondo, a large mesquite post, and stone block corners; thence north with Elizondo's survey, 13,428 varas, to its northwest corner a post and stone for the northeast corner of this survey on the south line of Las

Anacuas; thence west with said Las Anacuas 7,500 varas to the place of beginning, containing 5 leagues, 9 labors, and 235,000 square varas. The original La Huerta grant called for 4½ leagues, 3 labors, and 125,000 square varas. The land granted by this patent, as well as the land in controversy, is shown by the following plat:

entitled to recover. Appellant contends that said grant is void for the reasons (1) that it was issued in 1848 when the state of Tamaulipas had no jurisdiction over land in Texas; (2) that if issued October 15, 1835, it is void for the reason that the governor of Tamaulipas at that time had no authority to grant land in that state. The appellant further

The appellees connect themselves with the original grant to Gonzales, and, if the land in controversy is embraced in said grant, they are entitled to the same, provided said grant is legal, and conveys title to the grantee therein. If said grant is illegal, or if the land in controversy is not embraced in the boundaries of said grant, the state is

contends that the land in controversy is not embraced in said grant.

This case was tried before the court without a jury, and judgment rendered in favor of appellees. No findings of fact or conclusions of law by the trial judge were filed, but a full statement of facts has been filed by appellant.

Opinion.

[1] 1. It is the contention of appellant that final title by the state of Tamaulipas did not issue until 1848, and that what was done in 1835 vested only an inchoate title, that such title cannot be asserted in the courts of this country. If appellant is right upon the facts, its conclusions of law are correct. "It is no longer an open question that an imperfect title emanating from a former and unrecognized by the existing government forms no foundation for an action." Paschal v. Perez, 7 Tex. 365. See, also, Kemper v. Victoria, 3 Tex. 135; McMullen v. Hodge, 5 Tex. 34; Hancock v. McKinney, 7 Tex. 384; Board of Land Com'rs v. Bell, Dallam Dig. 336; Jones v. Borden, 5 Tex. 410; Hosner v. De Young, 1 Tex. 764; Paschal v. Dangerfield, 37 Tex. 273.

[2] But appellant is mistaken in supposing that his title issued in 1848. The statement in the certificate of Villereal that this document is delivered to him, Gonzales, in said town of Camargo, the 10th of the month of October, 1848, has reference to the certificate of said Villereal as to the genuineness of the signatures to said grant, and not to the grant itself. This certificate, together with the certificate of the notary and the United States consul, was not necessary. The grant was complete without them.

[3] 2. In support of the contention that the governor of Tamaulipas had no authority on the 15th day of October, 1835, to issue this title, we are referred to the act of the Mexican Congress of October 3, 1835, together with the accompanying regulations issued by the president ad interim. This act and said regulations are set out in full in the case of State v. Gallardo, 135 S. W. 672–674. Construing the same in said case, this court said: "Concerning the regulation above quoted, three questions arise, and these are: First. Is it any part of the law enacted by the Congress which had formed itself into an assembly, or is it merely a regulation prescribed by the acting president? Second. Whether it derived its sanction from the one or the other source, was it intended as a limitation upon the powers theretofore vested in governors to make sales of lands and other public property, or was it intended merely as instructions to governors not to continue to exercise such power without the previous approval of the supreme government? * * * But, aside from these questions, and considering together all the regulations prescribed by the president ad interim, it is by no means clear that it was intended by the thirteenth regulation set out above to limit the power formerly existing in governors to effectuate sales of lands and other property belonging to the government; and, if doubt exists in that regard, such doubt should be resolved in favor of purchasers under sales made by authority of the government." The regulations above referred to, 16 in number, are preceded by the following statement: "And that the hereinbefore inserted law may be fully and exactly complied with in relation to the administration of the revenues of said states, his excellency the president ad interim has directed that the following resolution be observed:" No. 13 of said regulations is as follows: "Until the attributes of the government and departmental boards in what relates to the treasury are declared by law, said governors shall make no sales of lands (fincas) or property (bienes) nor contracts nor extraordinary expenses for said department without the previous approval of the supreme government." There can be no question as to the power of the Mexican states to grant public lands within their respective boundaries prior to the passage of the act of October 3, 1835, and the instructions issued thereon by the president ad interim above referred to. It will be observed that the said act of Congress makes no reference to public lands. Said regulation No. 13 does not undertake to deprive the governors of states of their power to make such sales, but instructs them not to exercise such power until the attributes of the government and departmental boards (created by this act) are declared, without the previous approval of the supreme government. Granting that these regulations were made by competent authority, and that it was the duty of the governors to observe them, still, they were no more than mere regulations, indicating under what circumstances the recognized power of sale should be exercised.

[4, 5] 3. Granting that these regulations were made by competent authority, when did it become the duty of the governors to obey them? Not until they were received by such governors. The principle is analogous to the case where an agent is given authority to do certain acts, and the principal afterwards writes the agent not to do such acts without previously submitting the matter to the principal and receiving his approval. The act of the agent in such case, done in conformity with the power given him, and prior to receiving such instructions, would be binding on the principal. The regulations in question seem to recognize this principle. Article 1 of said regulations begins as follows: "As soon as the present regulations are received in every place," etc.

[6] While under the legal fiction that everybody is presumed to know the law, it will be presumed that such knowledge exists throughout the government as soon as a law is passed at the capitol, there is no such presumption as to instructions given by the heads of departments or by the governor or president as to the regulations formulated for carrying a law into effect. It is not made to appear when these regulations were issued. They may have been issued on the day the act was passed (October 3, 1835).

They may have been issued days, weeks, or even months afterwards. We know as a matter of general history that Victoria, the capital of Tamaulipas, is a considerable distance from the city of Mexico, the capital of Mexico, that between them are high mountains and stretches of desert, and that in 1835 there was no communication between these cities by railroad, telegraph, or telephone. It is also reasonable to presume that in the then unsettled condition of the country, by reason of revolutions and civil wars, mail facilities were not good. From these considerations it ought to be presumed, if necessary to sustain the grant, that the regulations above referred to were not received by the governor of Tamaulipas prior to the 15th of October, 1835, in consequence of which he had not at that date been deprived of the power to issue the grant in controversy.

[7] "He who alleges that an officer intrusted with an important duty has violated his instructions must show it." U. S. v. Coe, 170 U. S. 697, 18 Sup. Ct. 751, 42 L. Ed. 1202. And this includes that he must show that such instructions were received. At least, where the circumstances indicate that they probably could not have been received, the presumption that an officer does his duty will overcome the presumption that such instructions had been received. Speaking of the presumption that officers act within their powers, the court in Coe's Case, supra, quotes with approbation from the case of Strother v. Lucas, 12 Pet. 410, 9 L. Ed. 1137, as follows: "Courts ought to require very full proof that he has transcended his powers before they so determine it." The Coe Case involved the validity of a Spanish land grant.

[8] 4. For another reason we think the Huerta grant ought to be upheld in this case. Said regulations No. 13 instructed the governors to make no "sales" of lands without the previous approval of the supreme government. Concede that technically the sale was not made until the governor issued the grant October 15, 1835, still the transaction must necessarily have been in progress for some time previous to that date. Even when Mexico was a Spanish province, and the viceroy was the alter ego of the absolute monarch of Spain, a grant of land by such viceroy was preceded by the action of the local authorities, which included an application to purchase, an investigation of the character of the purchaser, the determination of whether or not the land was claimed by any one else, and a survey and appraisement of the land, all of which was duly certified to the viceroy, and became archives of his office. These regulations were, in substance, re-enacted by the various states of Mexico. The grant in this case recites that "the proceedings which the colonization law marks out having been carried out, as

is evident from the document formulated to that effect, having paid to the public treasurer of the state the sum of," etc., and it further appearing that the survey having been made by the surveyor general on September 15, 1835. It is thus apparent that Gonzales had acquired such an equitable title to said land, as early as September 15th, as ought, in good conscience, to have been recognized by the government of Mexico in thereafter withdrawing her public lands from sale. For this reason, we do not think that it should be held that the president ad interim intended that the temporary embargo placed by him on the future sale of lands should apply to a transaction of the character shown in this case.

[9] 5. In the previous part of this opinion we have assumed that the act of October 15, 1835, was legal, and that the president ad interim had authority to issue said regulations. But is such the case? It is true that Mexico, upon attaining her independence from Spain, became the owner, by virtue of the right of eminent domain, of all of the public lands within her boundaries. But she had the right to cede them to the states which were thereafter formed under the Constitution of 1824. We quote from said Constitution as follows:

"Art. 5. The nation adopts for the form of its government a popular representative and federal republic.

"Art. 6. Its integral parts are free, sovereign and independent states, in as far as regards exclusively its internal administration according to the rules laid down in this act, and in the general Constitution."

Among the states named in the Constitution is Tamaulipas, known also as New Santander. Among the powers reserved exclusively to the federal government, the sale of public lands is not mentioned, nor are such sales mentioned among the things which are prohibited to the states. White's Laws of Mexico, pp. 374, 380, and 387–410. Thus it will be seen that the states were competent to receive and hold title to the public lands within their borders. We do not know of any act of the Mexican Congress where title to such lands was formally vested in the states. No full compilation of the laws of Mexico is accessible to us.

The Supreme Court of this state, speaking through Mr. Chief Justice Hemphill, in the case of Republic v. Thorn, 3 Tex. 506, said: "There was no pretense, however, on the part of the federal government that she could, by her own agency, colonize lands lying within the limits of a state, without previous purchase, and a consequent assent of the state authorities. * * * The property in the soil is virtually acknowledged to be in the state." The ownership of the states to the public lands appears to have been conceded by the colonization act passed by the Mexican Congress August 18, 1824. Article 3 of said act authorized the congress-

es of the states to pass laws for the colonization of such lands; and article 5 reserved to the federal government the right to use "such of said lands as might be necessary for the erection of warehouses, arsenals or other public buildings." Reynolds' Laws of Mexico, 121. The revenue law of August 4, 1824, enumerates certain revenues as belonging to the federal government, which do not include revenues from the sale of public lands, and then declares (article 11) "the revenues not included in the foregoing articles belong to the states." Reynolds, 118. As above stated, the act of August 18, 1824, reserved the right of the federal government to take public lands for arsenals, etc. The act of April 6, 1830, authorized the federal executive to exercise this power, but declared that he "shall give the states credit for their value on the account they owe the federation." Reynolds, 148. In view of the matters above set out, we think it ought to be conceded that the states were the owners of the public lands within their boundaries. This being true, they would have the right to dispose of them in such manner as they saw proper, not inimical to the public policy of the federal government as declared by statutes duly enacted. An attempt to prevent the state of Coahuila and Texas from disposing of its vacant land for the purpose of colonization was declared by our Supreme Court in Republic v. Thorn, 3 Tex. 508, to be an "attempted exercise of arbitrary power, not warranted by the seventh article of the law cited (Colonization Law of August 18, 1824), nor by any constitutional powers of the General Congress." The act referred to by Mr. Chief Justice Hemphill in Republic v. Thorn, supra, was passed by a constitutional congress of Mexico, but the act of October 15, 1835, relied upon by appellant, was the act of usurpers, who thereby undertook to destroy the state governments of Mexico by abolishing their legislatures; and the regulations issued by the so-called president ad interim were the acts of a dictator, undertaking to exercise authority contrary to the Constitution of Mexico, and whose government was subsequently repudiated by the people of that country. We are not called upon to deal with the acts of a de facto government, by virtue of which property rights were acquired, as would be the case if the grant in question had been issued by such government; but we are asked to strike down a grant issued by a sovereign state in strict conformity with law, unless this edict of an usurper destroyed the laws of the state. We do not feel called upon to hold that regulation No. 13, above referred to, deprived the governor of Tamaulipas of the power to issue the grant in question, for the reason that the authority of the revolutionary body to pass the act of October 15th and of the president ad interim to issue said regulation No. 13 was, to say the least of it, doubtful; and we think such doubt should be resolved in favor of the citizens of Texas, and of their property rights in their homes.

[10] 6. Holding as we do that the grant issued by the state of Tamaulipas is legal, the question remains, Is the land in controversy embraced in the boundaries of said grant? The evidence in this case presents two theories as to the location of the boundaries of said grant. One is by course and distance from the established southwest corner of Las Anacuas grant, and the other is the call for the surrounding surveys. There is no hard and fast rule of law giving precedence to either of these calls. The rule in this, as in all cases where different calls lead to conflicting results, is that preference should be given to those calls which most probably indicate the intention of the grantor, as expressed in the face of the grant, read in the light of the surrounding circumstances.

[11] 7. Where there is an actual survey, and the field notes of such survey are expressed in the grant, it will be conclusively presumed that the grantor intended to convey the land embraced in such survey; and hence the primary rule that in such cases we should follow the footsteps of the original surveyor.

[12] 8. When a surveyor has made a mistake in some of his calls, how are we to know which of his calls correctly describe his footsteps? In all cases where two calls, descriptive of a line or corner, lead to different results, as where the call is to run from a given point a certain course and distance to another point, and such other point will not be reached by running said course and distance, one or the other of said calls was inserted by mistake, and the mistaken call should be disregarded. The purpose of all rules in reference to the comparative dignity of calls is to ascertain which of contradictory calls are the mistaken ones.

[13] 9. In this grant there are no field notes, in the sense in which that term is ordinarily used, viz., notes made by the surveyor in the field while making the survey, describing by course and distance, and by natural or artificial marks found or made by him, where he ran the lines and made the corners. We have only a map made by the surveyor and his memoranda explanatory of said map. If we take said map as indicating that he ran from the established southwest corner of the San Anacuas grant south 200 cordels (10,000 varas), thence west 27 cordels (1,350 varas), thence south 125 cordels (6,250 varas), and thence east, north, east, north, and west to the beginning, then he did not include the land in controversy in said survey. On the other hand, if said survey was made so as to coincide with the boundaries of the San Andres and San Pedro de Charco Redondo grants, as shown by the surveyor's notes explanatory of said map, it did include the land in controversy.

10. As to courses and distances, it will be seen from the field notes in the La Huerta, as patented by the state, that while the course and distance from the southeast corner of Las Anacuas (south 10,000 varas) is the same as is shown upon the map attached to the La Huerta grant, and the second call (west 1,355 varas) is practically the same, the third call in the patent is south 6,944 varas, instead of 6,250 varas, as shown by said map, the fourth call in the patent is south 80 east 6,355 varas, in lieu of east 6,500 varas in the grant. The fifth call in the patent is north 10 degrees east 5,000 varas, in lieu of north 6,250 varas. The sixth call in the patent is south 80 east 1,770 varas, in lieu of east 2,350 varas, and the seventh call is north 13,428 varas, in lieu of north 10,000 varas. The eighth call in the patent is the same as that in the grant, viz., west 7,500 varas. It is evident from the calls and descriptive matter in the field notes of the patent that the same were made from an actual survey. Why the departure on four of the six lines from the calls in the grant? Evidently, in order to make said survey extend to and coincide with the lines and corners of the surveys called for in the grant on the south and east. If there are mistakes in the map as to both course and distance to lines and corners of the adjacent grants on the south and east, does it not render it probable that calls for distance on the west were also mistakes, when it is found that such calls will not coincide with the boundaries of the surveys called for on these lines?

The map shows Arroyo Agua Poquita (creek of Little Water) near the corner 10,-000 varas south of the southwest corner of Las Anacuas, and this same creek near the next corner 1,350 varas west. The field notes of the patent do not call for any creek near these corners.

[14] 11. The weight to be given to a call for the line or corner of a previous survey depends very much upon whether or not the lines or corners of such survey were probably known to the surveyor at the time he made his survey. Could he have identified them by natural or artificial calls on the ground, or by running from their known corners? The San Pedro de Charco Redondo (St. Peter of the Round Water Hole), as patented by the state, calls to begin "in the middle of Charco Redondo, a round water hole in Palo Blanco creek." Presumably this round water hole was of some notoriety, as it gave its name to the Ramirez grant. The field notes call to run from the beginning corner up the Palo Blanco 5,290 varas to a rock in the bed of said creek; thence north 1 degree 15 west 22,587 varas, "to original rock corner; thence east 6,400 varas to Los Olmos creek, which is shown to be another name for Agua Poquita creek; at 6,500 varas, a pile of rock." It thus appears that lines and corners of the Charco Redondo survey could easily have been found and identified by the surveyor who surveyed La Huerta, and who probably made both of said surveys, if La Huerta was actually surveyed on the ground, and that the northeast corner of Charco Redondo is within 100 varas of Agua Poquita. The corresponding corner of La Huerta, marked "h" on the map, should be near said creek.

12. If La Huerta be constructed by running from the southwest corner of Las Anacuas south 10,000 varas, thence west 1,350 varas, thence south 2,470 varas for a corner of San Andres, thence west 2,091 varas to the northwest corner of the Charco Redondo, and thence with the lines of Charco Redondo, Concepcion, and the other surveys called for in the grant, we will have eight instead of six sides, as shown by the map. But we do not think this is the proper way to construct this grant. The line should extend from the southwest corner of Las Anacuas to the southeast corner of the San Andres. This San Andres grant is called in the map San Juan del Mesquital (St. John of the Mesquite thicket). The name San Andres perhaps got into the patent on account of its belonging to Andres Garcia, and the surveyor, by mistake or otherwise, made a saint out of the owner. There is no dispute as to the northeast corner of this survey, nor as to its southwest corner. Its southwest corner is described in the field notes in the patent, made upon actual survey, as "a stone monument designated as Lindero (landmark) de San Juan del Mesquital. By extending the east and west lines from their known corners to the point of intersection, the southeast corner of this survey can be found. This corner being thus established, the La Huerta grant should be run out by beginning at the southeast corner of the Las Anacuas, and running thence south 12,470 varas to the southeast corner of San Juan del Mesquital, as indicated by the dotted line on the second map in the statement of facts; thence west 2,441 varas, to the northeast corner of Charco Redondo; and thence with the lines of the other surveys called for in the grant, to the beginning.

[15] 13. In addition to the call for stone monuments in the field notes contained in the patents at the northwest corner of Charco Redondo and the southwest corner of San Andres, or San Juan del Mesquital, the field notes in the patent of the Huerta call for a stone block on the western boundary of the Falcon for the southeast corner of the Huerta, "this being the corner mark designated in the original survey as San Amador." We attach considerable importance to the calls in the patent for these original stone monuments, for the reason that the law of Tamaulipas required corners to be erected of quarried rock and lime mortar. The writer has seen many of these stone monuments in Mexico, from one to two feet in diameter, and

from two to four feet high, erected more than a century ago. That the surveyor who resurveyed the Huerta grant in 1868 did not find these stone monuments where he made his second, third and fourth corners we think can be accounted for on the theory that he did not correctly retrace the lines of the original grant.

[16, 17] 14. We have thus far proceeded upon the theory that the surveyor general of Tamaulipas made a survey on the ground of the La Huerta grant. Such is the presumption as to all surveys, in the absence of evidence to the contrary; but such evidence need not be direct. We think the circumstances in evidence in this case tend to show that no such survey was made, but that it was an office survey. These circumstances are that La Huerta grant was entirely surrounded by other surveys, the corners of which were required by law to be marked by permanent stone monuments. It is probable from the history of the country that these surveys had been recently made. No bearing trees are given, though the subsequent field notes made by the state show that at most, if not all, of the corners there was timber suitable for bearing trees and the distances to the streams shown upon the map are not given. If the survey was an office survey, it clearly appears that it was the intention of the surveyor to extend La Huerta to the boundaries of the San Pedro de Charco Redondo grant, as well as to the boundaries of the other surrounding grants.

15. The fact that the land was pasture land, and that the Mexican states granted said land in quantities of a league or more, and that the 1,770 acres in controversy would have been considered worthless for the purpose of another grant, strengthens the conclusion that the state of Tamaulipas did not intend to reserve said land, but did intend to include in the La Huerta grant all of the land left vacant in the location of the surrounding grants. In our opinion the call for the Charco Redondo should prevail over the call for distance; but, to say the least of it, these two conflicting theories are presented under the evidence in this case, each of which is supported by evidence; and, the trial court having found in favor of the theory that the La Huerta grant should be extended to the Charco Redondo, it would not be proper for us to reverse the case, unless the evidence was very strong against such theory and in favor of the adverse theory. It appears from the evidence in this case that the appellees, humble Mexican citizens of Texas, have made their homes upon the land in dispute and cultivated their little farms for between 40 and 50 years, and we do not feel called upon, under the evidence in this case, to overturn the judgment of the trial court giving them their land.

Finding no error in the record, the judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

[18] Appellant in its motion for rehearing insists that the explanation of the map attached to the original grant should not be considered, for the reason that the grant states that the land granted is "fixed under the corners and boundaries set forth in the attached map." The attached map has upon it the letters "a," "b," "c," "d," "mi," "h" and "g," as shown in the opinion herein. These letters, without any explanation, would be meaningless; but under said map in the original grant is the explanation of same, made by the surveyor general, showing that these letters indicate the boundaries of the surrounding surveys. This explanation indorsed on the map is a part thereof.

Appellant finds fault with the conclusion of this court that the "descriptive" matter in the field notes of the patent was made from an office survey. Our reasons for this conclusion are set forth in the fourteenth subdivision of the opinion; but the correctness of this deduction is not essential to the correctness of the judgment rendered herein. If "La Huerta" was an actual survey, and the surveyor began on the southwest corner of "Las Anacuas," then he made a mistake in his call for distance in his first and second line, as is evidenced by his call for the southeast corner of the San Juan del Mesquital as being at the end of his first run, and the northeast corner of the Ramirez as being at the end of his second run, as shown by the notations on said map. It is true that to run the first line south 10,000 varas, as shown by the map, would reach the southeast corner of the San Andres (San Juan del Mesquital), as said survey was patented by the state; but the second call, west 1,350 varas, would not reach the Ramirez, but, on the contrary, would reach the inner corner of the San Andres as patented by the state. In the original opinion herein we stated that we thought the proper way to construct La Huerta grant was to extend its first line from the southwest corner of Las Anacuas to the southeast corner of the San Juan del Mesquital (San Andres), and that this corner could be found by extending the east and south lines of said land from their known corners to the point of intersection, which would give a distance of 12,470 varas for the first line of La Huerta, instead of 10,000. We did not by this language mean the San Andres as patented by the state, but we meant the San Juan del Mesquital as it was at the date of the survey of La Huerta, at least, as the surveyor who made the La Huerta supposed it to be, as shown by his map. The field notes of San Juan del Mesquital as granted by the Mexican government are not in the record; but

the map attached to La Huerta indicates the east line of the same is an unbroken line, and its southeast corner is east of the northeast corner of the San Pedro de Charco Redondo (Ramirez). The field notes of the Ramirez survey as granted by the Mexican government are not found in the record, but, as there is nothing to indicate the contrary, we must presume that they are the same in the patent as in the Spanish grant. As stated in the opinion, the original southwest corner of San Juan del Mesquital and the northeast corner of San Pedro de Charco Redondo (Rafael Ramirez) as made by the surveyor of these Spanish grants are found and identified upon the ground, and called for in the patents issued by the state.

[19] Appellant asks us to pass specifically upon its third assignment of error, which is to the effect that appellees are estopped by the patent issued by the state to the heirs of Jose Antonio Gonzales, original owner of La Huerta grant, from claiming any land not included in said patent. We overruled this assignment for the reason that there is nothing in the record to show that the appellees herein, or any of them, or those under whom they claim, had anything to do with the granting of said patent or the making of the survey by virtue of which said patent was issued. On the contrary, it appears from the record that in 1872, soon after the issuance of said patent, Salome Fierros and Antonio Maria Palacios, assignees of a portion of the heirs of Antonio Gonzales, deceased, for themselves and for all of the heirs of Antonio Gonzales, deceased, by their attorney, J. L. Hays, protested against said survey and patent as being incorrect. And it further appears that some of the appellees herein have been living on and claiming the land in controversy for a great many years, thereby showing that they did not acquiesce in the issuance of said patent, or the correctness of the description therein contained.

Motion for rehearing overruled.